842 F.2d 314
 9 ITRD 2257, 6 Fed. Cir. (T) 92
 E.C. McAFEE COMPANY and St. Paul Fire and Marine Insurance
Company, Plaintiffs-Appellants,
American Air Parcel Forwarding Company, Ltd., Plaintiff,
v.
The UNITED STATES, the United States Customs Service and the
Commissioner of Customs, Defendants-Appellees.
 No. 87-1441.
 United States Court of Appeals,
Federal Circuit.
 March 1, 1988.
 
 Leonard L. Rosenberg, Sandler & Travis, P.A., Miami, Fla., for plaintiffs-appellants.
 Kenneth N. Wolf, Commercial Litigation Branch, Dept. of Justice, of New York City, for defendants-appellees. With him on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Attorney in Charge, Intern. Trade Field Office.
 Before MARKEY, Chief Judge, and RICH and NIES, Circuit Judges.
 NIES, Circuit Judge.
 
 
 1
 This is an appeal, pursuant to 28 U.S.C. Sec. 1295(a)(5) (1982), by E.C. McAfee Company and St. Paul Fire and Marine Insurance Company from the final judgment of the United States Court of International Trade in American Air Parcel Forwarding Co. v. United States, 664 F.Supp. 1434 (CIT 1987) (DiCarlo, J.), sustaining the assessment of duties under 19 U.S.C. Sec. 1401a (1982), on the basis of the price paid by the United States customers to Hong Kong distributors for imported, made-to-measure clothing produced in Hong Kong ("consumer price"). Appellants maintain that the merchandise should be assessed on the basis of the cost to the distributors of tailoring services in Hong Kong with the addition of the cost of fabric and certain other adjustments ("assembly price"). We conclude that appellants' position is correct and, accordingly, reverse the judgment in favor of the United States.
 
 
 2
 * American Air Parcel Forwarding Company, Ltd. (AAP), importer of record, is a freight forwarder for Hong Kong distributors of made-to-measure clothing made in Hong Kong for customers in the United States. AAP consolidates the individual shipments of numerous distributors, sends the merchandise to Detroit, files entries for the merchandise, and forwards the clothing to the individual United States customer. McAfee is the customs broker for AAP in this transaction, and St. Paul is the surety.
 
 
 3
 A stipulation of the parties sets out the following additional facts. Orders for the subject custom-made clothing are taken either in the United States or in Hong Kong. In the former instance, sales representatives of Hong Kong distributors advertise their availability and set up a display of fabrics and styles, usually in a hotel, in the United States. The customer makes a selection, his measurements are taken, and an order form is written up. The customer remits the purchase price to the sales representative. The representative sends the order form to his distributor in Hong Kong. Other transactions originate in retail shops of distributors in Hong Kong, where tourists may place orders. In that instance, a similar procedure is followed in that the clothing is sent via AAP to the United States for forwarding to the United States customer.[1]
 
 
 4
 In either case, on receipt of an order, the distributors contract with tailors in Hong Kong to produce the clothing. The distributor supplies fabric to the tailor who manufactures the clothing and returns the finished apparel to the distributor. The tailors' manufacturing operation--the "CMT" operation--involves cutting the fabric, sewing the cut parts (making), and supplying the garment's trim, e.g., lining, buttons, etc. Upon receipt of the finished clothing, the distributor packs the clothing, addresses the package to individual customers, obtains quota and visa if necessary, and gives the package to AAP which the latter forwards as part of a consolidated shipment.
 
 
 5
 The United States Customs Service issued a ruling, Export Value: Dutiability of Sales from Manufacturers to Distributors, CLA-2: RRUCV 065056 # CW TAA # 10, C.S.D. 81-72, 15 Cust. B. & Dec. 876 (Oct. 17, 1980) [hereinafter "TAA # 10"], which ruled that "transaction value" for appraisement purposes under section 402 of the Tariff Act of 1930, as amended by section 201 of the Trade Agreements Act of 1979, 19 U.S.C. Sec. 1401a, was established by the "assembly price," i.e., the CMT price paid by the Hong Kong distributors plus the cost of the fabric and other adjustments specified in 19 U.S.C. Sec. 1401a (e.g., packing costs). A year later Customs changed its interpretation and issued another ruling, designated CLA-2-CO:R:CV:V, 542643 TLL, TAA # 40 (Oct. 19, 1981) (unpublished) [hereinafter "TAA # 40"]. TAA # 40 retroactively revoked TAA # 10 and ruled that transaction value for the subject entries is the U.S. customer's price. Retroactive revocation of TAA # 10 caused AAP's entries to be liquidated at substantially higher values than the entered values. Thus, Customs issued bills for increased duties. St. Paul paid the increased duty only on Entry No. 337670, entered on January 2, 1981. A protest was filed challenging the Customs Service's valuation, which was denied. AAP, McAfee, and St. Paul (collectively "the importers") unsuccessfully contested that denial before the Court of International Trade.
 
 II
 
 6
 It is agreed that the valuation of the subject merchandise is its "transaction value." The statutory provisions governing the assessment of duties on the basis of "transaction value" pertinent to this case are the following:
 
 
 7
 19 U.S.C. Sec. 1401a(b)(1). The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to--
 
 
 8
 (A) the packing costs incurred by the buyer with respect to the imported merchandise;
 
 
 9
 ....
 
 
 10
 (C) the value, apportioned as appropriate, of any assist....
 
 
 11
 The Customs regulations implementing these provisions include the following:
 
 
 12
 Sec. 152.103 Transaction value.
 
 
 13
 (a) Price actually paid or payable--
 
 
 14
 (1) General. In determining transaction value, the price actually paid or payable will be considered without regard to its method of derivation. It may be the result of discounts, increases, or negotiations, or may be arrived at by the application of a formula....
 
 
 15
 ....
 
 
 16
 (3) Assembled merchandise. The price actually paid or payable may represent an amount for the assembly of imported merchandise in which the seller has no interest other than as the assembler. The price actually paid or payable in that case will be calculated by the addition of the value of the components and required adjustments to form the basis for the transaction value.
 
 
 17
 19 C.F.R. Sec. 152.103(a) (1987). Subparagraph (3) is in accordance with the legislative history which states:
 
 
 18
 In some cases, the price actually paid or payable may represent an amount for assembly of merchandise in which the seller has no interest in the merchandise other than as assembler. In such cases the price actually paid or payable, adjusted by the addition of the value of the components and required adjustments, will form the basis for the transaction value.
 
 
 19
 Statements of Administrative Action, H.R.Doc. No. 153, 96 Cong., 1st Sess., pt. 2, at 442, reprinted in 1979 U.S.Code Cong. & Admin.News 381, 705. The importers contend that the facts here present the type of assembly operation which Congress contemplated would be used to determine transaction value under section 1401a(b).
 
 
 20
 The trial court interpreted the above regulations to provide that only if there were no sale of merchandise falling under section 152.103(a)(1) could a price be constructed based on assembly price under section 152.103(a)(3). Finding a sale of clothing between the distributor and the United States customer, the court held that the price of that sale determined transaction value. The court went on to hold that, in any event, the provisions of subparagraph (3) could not apply because the sale between the distributor and tailor was not "for exportation to the United States."
 
 III
 
 21
 The questions raised by this appeal are whether the custom-made clothing is assembled merchandise within the meaning of the regulation and, if so, whether the transaction value of the merchandise should be determined on that basis.
 
 IV
 
 22
 With respect to the question of the meaning of "assembled merchandise," an extant ruling of Treasury, Value: Appraisement of Women's Wearing Apparel, CLA-2: RRUCV 542181RP TAA # 8, C.S.D. 81-92, 15 Cust. B. & Dec. 921 (Oct. 15, 1980) [hereinafter "TAA # 8"], holds that where an importer/buyer purchased piece goods which it supplied to manufacturers (related and unrelated companies) to be made into garments for which service it paid a CMT price, "the transaction value for the merchandise would be represented by the price actually paid or payable for the garments (i.e., the CMT charge paid to the manufacturer) plus applicable additions as specified in section 402(b)(1)(A)-(E)." TAA # 8 at 2, 15 Cust. B. & Dec. at 922.[2] The trial court found that TAA # 8 was inapplicable here because of a difference in facts. While the facts are different in that TTA # 8 does not address custom-made clothing, we conclude that it applies at least to the extent that the CMT operation by Hong Kong tailors must also be considered an "assembly" and the imported goods to be "assembled merchandise" within the meaning of the regulation. See, e.g., Texas State Comm'n for the Blind v. United States, 796 F.2d 400, 406 (Fed.Cir.1986) ("authoritative administrative constructions [such as Customs rulings] should be given the deference to which they are entitled") (citing United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)), cert. denied, --- U.S. ----, 107 S.Ct. 874, 93 L.Ed. 828 (1987); Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1055 (Fed.Cir.) (deferential standard applies to review of agency's interpretation of its regulations), cert. denied, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983).[3]
 
 V
 
 23
 Determining that the transaction between the distributors and tailors results in "assembled merchandise" does not, however, ipso facto, mean that valuation on the basis of assembly price is appropriate. The trial court construed the regulations as establishing a preference for a sale of goods price (here, consumer price) over a sale of services price (assembly price):
 
 
 24
 Since there is a sale of the exported merchandise between the Hong Kong distributor and American customers in this case, the price paid or payable is determined under subsection (1) of the regulation [i.e., section 152.103(a)(1) ], and there is no reason to resort to subsection (3) [section 152.103(a)(3) ].
 
 
 25
 664 F.Supp. at 1437.
 
 
 26
 We cannot agree with that interpretation, and we note that the government does not advance that position on appeal. Subsection (a)(1) of section 152.103 is a general, all-inclusive provision which states only:
 
 
 27
 In determining transaction value, the price actually paid or payable will be considered without regard to its method of derivation.
 
 
 28
 Subsection (a)(3) states that "the price actually paid" may represent the amount for assembly (plus adjustments). We read subsection (a)(1) to encompass all prices which may be calculated to obtain transaction value, including a price calculated on the basis of assembly. No hierarchy of (1) over (3) is possible because (1) includes (3). Thus, both consumer price and assembly price are viable transaction values under the regulations, and we must look elsewhere for guidance on which is preferred.
 
 
 29
 The statute provides that transaction value is based on the price for the merchandise "when sold for exportation to the United States." In United States v. Getz Bros. & Co., 55 CCPA 11 (1967), a precedential decision of the Court of Customs and Patent Appeals, a similar, three-tiered, distribution situation was presented. While the Getz case was decided under 19 U.S.C. Sec. 1401a(b) as it appeared before amendment by the Trade Agreements Act of 1979, the language of the earlier statute is not significantly different from the quoted provision of the current statute. The issue in Getz was whether valuation of certain plywood should be at the manufacturer's price to a foreign middleman or that middleman's price to the United States customer. Two holdings in that case are significant here. First, a sale need not be to purchasers located in the United States to provide the basis for valuation. Second, if the transaction between the manufacturer and the middleman falls within the statutory provision for valuation, the manufacturer's price, rather than the price from the middleman to his customer, is used for appraisal. Id. at 18; R.J. Saunders & Co. v. United States, 42 CCPA 55, 59 (1954); United States v. S.S. Kresge Co., 26 CCPA 349, 352 (1939); accord Rodriguez v. United States, 23 Cust.Ct. 296, 300 (1949) ("no need to consider the dealers' resale prices since we have a manufacturer's price which meets the statutory requirement"). See also R. Sturm, Customs Law & Administration Sec. 41.2 at 254 (1980) ("Where a manufacturer or original seller and a dealer or 'trading house' both sell the merchandise at a price which meets the statutory standards for [valuation], the manufacturer's price is the basis of appraisement.").
 
 
 30
 The cited cases assume, without explanation, that if the importer establishes that his claimed, lower valuation falls within the statute, the importer is entitled to the benefit of that valuation even though Customs' valuation also satisfies the same statutory requirements. While an argument could be made that Customs should have the option to impose the higher duty in such circumstances, the cited precedent is to the contrary.
 
 
 31
 Thus, the issue here comes down to the factual question whether the merchandise being assembled by the tailors was "for exportation to the United States" so as to meet the statutory standard. The trial court found that "the transaction between the tailor and distributor is not one 'for exportation to the United States' " because "the tailor deals only with the distributor and 'may or may not know the identity or address of the customer,' stipulation at 5." 664 F.Supp. at 1437. The importers argue on appeal that the tailors receive information indicating that the tailor-made garment is for a United States consumer on each order form and that, in any event, the facts here establish that the clothing is being assembled for export to the United States regardless of the tailors' actual knowledge.
 
 
 32
 We conclude that the tailors' actual knowledge that the particular suits are destined for the United States is irrelevant. Where clothing is made-to-measure for individual United States customers and ultimately sent to those customers, the reality of the transaction between the distributors and the tailors is that the goods, at the time of the transaction between the distributor and tailors, are "for exportation to the United States." Apart from this factor, there is no dispute that the merchandise was being made for export to the United States. Accordingly, we hold that the trial court's finding to the contrary is clearly erroneous. See, e.g., Daw Indus., Inc. v. United States, 714 F.2d 1140, 1142 & n. 6 (Fed.Cir.1983) (clearly erroneous standard of review applies to Court of International Trade's findings of fact) (citing Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982), for the statement that "in Fed.R.Civ.P. 52(a), the 'clearly erroneous' standard applies to all questions of fact").
 
 
 33
 A determination that goods are being sold or assembled for exportation to the United States is fact-specific and can only be made on a case-by-case basis. Thus, while the analysis here sets forth a general approach to the problem, we wish to make clear that all assembly transactions where the assembled goods eventually reached the United States do not ipso facto provide the basis for valuation under section 1401a. Cf., e.g., Mitsui & Co. v. United States, 68 Cust.Ct. 266, 270 (1972) (when only evidence supporting destiny of merchandise was "testimony that the merchandise was marked and numbered for the United States by [the manufacturer,] ... [s]uch testimony is not comprehensive and as forceful as that in United States v. Getz " and sale by Japanese manufacturer to Japanese trading company, which shipped and sold to United States customers, found not for export to United States). The merchandise at issue is unique in that, from the time of the initial contact until eventual importation, the goods in question were being made for a specific United States consumer, not the United States market generally. That should not be taken to mean that only goods tailor-made for a United States individual are goods clearly destined for the exportation to the United States, but rather that it is, in this case, the factor which compels a reversal of the finding that the goods were not for exportation to the United States at the time of assembly.
 
 VI
 
 34
 As part of this appeal, McAfee and St. Paul have challenged the order of the Court of International Trade in American Air Parcel Forwarding Co. v. United States, 587 F.Supp. 550 (CIT 1984) (Carman, J.), granting the government's partial summary judgment motion upholding the retroactive revocation of a Customs Service ruling which had evaluated the merchandise at issue at assembly price. For background on that issue, see American Air Parcel Forwarding Co. v. United States, 718 F.2d 1546 (Fed.Cir.1983), cert. denied, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984). In view of our disposition of the appeal on the merits, we need not reach the retroactive revocation issue. We deem it advisable to vacate the published order of the Court of International Trade, however, to negate its precedential value.
 
 Conclusion
 
 35
 For the foregoing reasons, the judgment of the Court of International Trade is reversed.
 
 
 36
 REVERSED.
 
 
 
 [1]
 Garments which are picked up by tourists in Hong Kong are not involved in this case since they are not entered by AAP
 
 
 [2]
 The fabric in such case is treated as an "assist" under section 1401a(b)(1)(C)
 
 
 [3]
 The government's argument that transaction value for goods can never be based on the price of services for making the goods is contradicted by TAA # 8, as well as by the legislative history. See, e.g., Alaskan Arctic Gas Pipeline Co. v. United States, 831 F.2d 1043, 1046 (Fed.Cir.1987) (when statutory language fails to provide adequate guidance, we must read legislative history of statute to determine Congress' intent)