**NISSHO IWAI AMERICAN CORP.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 92–1239.

United States Court of Appeals,
Federal Circuit.

Dec. 28, 1992.

Ned. H. Marshak, Sharretts, Paley, Carter & Blauvelt, P.C., New York City, argued for plaintiff-appellant, with him on the brief was Peter Jay Baskin.

John J. Mahon, Dept. of Justice, argued for defendant-appellee, with him on the brief were Stuart M. Gerson, David M. Cohen, and Joseph I. Liebman. Of counsel was Chi Choy, U.S. Customs Service.

Before RICH, ARCHER, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Nissho Iwai American Corporation (NIAC) appeals from the judgment of the United States Court of International Trade granting the government's cross-motion for summary judgment and counterclaim on NIAC's challenge of a valuation determination by the United States Customs Service. *Nissho Iwai American Corp. v. United States*, 786 F.Supp. 1002 (1992). In granting summary judgment, the trial court held that the transaction value of the imported merchandise at issue, as defined in 19 U.S.C. § 1401a(b)(1) (1988), was properly based on the price of the sale from the middleman to the ultimate United States purchaser. Because the transaction value in this case must be based on the price of the sale from the foreign manufacturer to the middleman, we reverse the trial court's grant of summary judgment. With respect to the government's counterclaim, the trial court held that a buying commission received by NIAC was not entitled to be deducted from dutiable value because there was no *bona fide* agency relationship. We affirm the trial court's grant of the government's counterclaim.

## BACKGROUND

This appeal concerns the proper dutiable value of 205 rapid transit passenger cars

imported to the United States from Japan during 1983–1985. The vehicles at issue were imported pursuant to a three-tiered distribution arrangement involving a manufacturer, Kawasaki Heavy Industries Ltd. (KHI), a middleman, Nissho Iwai Corporation (NIC), and a purchaser, the Metropolitan Transportation Authority of New York City (MTA). NIC and KHI are independent corporations organized under the laws of Japan. The MTA is a public benefit corporation of the State of New York.

In 1981, NIC and KHI conducted preliminary negotiations regarding the possible manufacture of subway cars by KHI for the MTA. By means of a contract dated March 17, 1982, the MTA agreed to purchase 325 passenger cars from NIAC, a wholly-owned U.S. subsidiary of NIC, for use in the New York City Transit System. Article VI–C of the contract specified that "the passenger cars to be furnished hereunder will be manufactured and produced by Kawasaki Heavy Industries, Ltd., Japan." The contract also stipulated that the vehicles would be manufactured using components from both the United States and Japan.[1] The MTA purchased the cars at the unit price of $844,500 per car as provided in Article VII–A(a) of the contract. On the same day the contract was entered into by the MTA and NIAC, NIAC assigned all of its rights and obligations under the contract to NIC pursuant to Article VI–A. KHI also signed a warranty of performance to the MTA and NIAC on that date.

Pursuant to a contract dated March 23, 1983, NIC placed an order with KHI for the production of the 325 passenger cars subject to the NIC/NIAC–MTA contract of March 17, 1982. Under the KHI–NIC agreement, KHI agreed to manufacture the 325 vehicles in Japan in accordance with the specifications of the NIC/NIAC–MTA contract, said vehicles to be delivered to NIC "FOB, Kobe Japan." The vehicles manufactured and delivered by KHI were specifically intended for sale to the MTA and could not be used for any other pur-

---

1. The parties estimated that the cars would be comprised of 57.45% Japanese-made components and 42.55% American-made components.

pose. The payment by NIC to KHI was negotiated to be ¥ 80,002,100 per vehicle, plus escalation and change order payments determined under a formula specified in the NIC/NIAC–MTA contract.

The 325 passenger cars subject to the NIC/NIAC–MTA and KHI–NIC contracts were imported in sixteen entries from August 18, 1983 through June 27, 1985. Upon entry, the imported vehicles were classified under item 690.10, Tariff Schedules of the United States (TSUS),[2] dutiable (at the rate in effect at the time of each entry) on the full value of the imported merchandise less the cost or value of products of the United States included in such value pursuant to item 807.00, TSUS.

Duties were assessed by Customs on the basis of the "transaction value" of the imported vehicles, as that term is defined in 19 U.S.C. § 1401a(b)(1).[3] The transaction value of the first 120 passenger cars (the first eleven entries) was determined on the basis of the KHI–NIC sales price. The entry of those vehicles is not at issue.[4] The remaining 205 cars, however, were appraised by Customs at the price paid by the MTA to NIC/NIAC, less certain deductions which Customs considered appropriate.[5] Specifically, Customs determined that each of the imported vehicles at issue had a dutiable value of "US$542,036.45, per unit

less appropriate duties net." Upon making the necessary duty deductions, the final dutiable value per vehicle was assessed at $497,737.61 for vehicles entered in 1983, $500,495.16 for vehicles entered in 1984, and $503,751.17 for vehicles entered in 1985.[6]

On August 4, 1983, NIAC protested Customs' appraisals of the value of the imported merchandise and requested that Customs issue a ruling holding that the dutiable value of the vehicles should be based on the price paid by NIC to KHI. Customs responded that it "was [initially] refraining from issuing a ruling in this case" because the issue whether the KHI–NIC sales price could represent the "relevant sale for exportation to the United States under 19 U.S.C. § 1401a(b)(1)" was "involved in a case which [was then] currently pending" before the Court of International Trade. That case was *American Air Parcel Forwarding Co. Ltd. v. United States*, 11 C.I.T. 193, 664 F.Supp. 1434 (1987), *rev'd sub nom. E.C. McAfee Co. v. United States*, 842 F.2d 314, 6 Fed.Cir. (T) 92 (Fed. Cir.1988).

The entries at issue were finally liquidated in December 1985. Customs adhered to its determination that the transaction value of the imported vehicles was represented by the contract price between the

---

**2.** The Tariff Schedules of the United States were superseded by the Harmonized Tariff Schedules of the United States, effective January 1, 1989, pursuant to the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107 (Aug. 23, 1988). Neither party disputes that the imported merchandise is properly classified under item 690.10, TSUS.

**3.** 19 U.S.C. § 1401a(b)(1) (1988) provides in pertinent part:
> The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold *for exportation to the United States*, plus amounts equal to—
> (A) the packing costs incurred by the buyer with respect to the imported merchandise;
> (B) any selling commission incurred by the buyer with respect to the imported merchandise;
> (C) the value, apportioned as appropriate, of any assist;
> (D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a con-

dition of the sale of the imported merchandise for exportation to the United States; and
> (E) the proceeds of subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller. [Emphasis added.]

The price is also subject to certain deductions specified in § 1401a(b)(3)(A)–(B).

**4.** NIAC also paid $884,655.99 in additional duties that were attributable to the entries liquidated at the KHI–NIC sales price. The government has abandoned its claim to those additional duties.

**5.** In determining the final dutiable value per vehicle, Customs deducted a total of $347,355.32 from each vehicle for various nondutiable costs, charges, and payments associated with the price paid by the MTA to NIC/NIAC.

**6.** The final dutiable value of each vehicle was determined by deducting from $542,036.45 duties of 8.9% for 1983 entries, 8.3% for 1984 entries, and 7.6% for 1985 entries.

MTA and NIC/NIAC. NIAC commenced an action in the Court of International Trade for reliquidation of the imported vehicles based upon the price paid by NIC to KHI. NIAC argued that this court's decision in *McAfee* mandates that the appraisal of the value of the imported vehicles be based on the price paid by the middleman to the manufacturer, *i.e.*, the KHI–NIC price.

Before the trial court, the parties filed cross motions for summary judgment on the reliquidation claim. Following the analysis of *Brosterhous, Coleman & Co. v. United States*, 737 F.Supp. 1197 (Ct. Int'l Trade 1990), the court determined that the contract between the MTA and NIC/NIAC "was the contract which most directly caused the goods to be exported to the United States" and thus held that the value of the vehicles was properly based on the NIC/NIAC–MTA contract price. The court also found that NIAC was not a *bona fide* buying agent and concluded that a commission paid by NIC to NIAC for procuring American-made components subject to a duty exemption under item 870.00, TSUS could not be deducted from the NIC/NIAC–MTA sales price.

## DISCUSSION

■ On appeal to this court, NIAC argues that the trial court failed to follow the holding in *McAfee* that the price of the initial sale from the manufacturer to the middleman must be used for appraisal, not the price of the sale from the middleman to the purchaser. NIAC further contends that the trial court erred in granting the government's counterclaim. We review the trial court's grant of summary judgment for correctness as a matter of law, deciding *de novo* the proper interpretation of the governing statute and regulations. *Guess? Inc. v. United States*, 944 F.2d 855, 857 (Fed.Cir.1991).

### I. Transaction Value

■ The parties do not dispute that the imported vehicles must be appraised on the basis of "transaction value." The transaction value of imported merchandise is defined in Section 402(b)(1) of the Tariff Act of 1930, as amended by section 201 of the Trade Agreements Act of 1979, codified at 19 U.S.C. § 1401a(b)(1), as the "price actually paid or payable for the merchandise when sold for exportation to the United States," subject to certain additions and deductions as noted earlier. The primary issue here is whether the trial court erred in determining that the NIC/NIAC–MTA contract price is the price actually paid or payable for the imported vehicles when sold for exportation to the United States.

*McAfee* similarly involved a three-tiered system for distributing custom-made clothing assembled in Hong Kong to purchasers in the United States. Under this system, purchasers' orders for the clothing were taken by a distributor who then contracted with tailors in Hong Kong to produce the clothing. Upon receipt of the completed clothing, the distributor imported the items into the United States and forwarded them to the purchasers. The clothing entries were liquidated pursuant to an assessment of transaction value based on the price to the U.S. purchasers rather than the price paid by the distributor to the Hong Kong manufacturers.

The principal issue addressed by the court in *McAfee* concerned the proper transaction value of the imported merchandise. In resolving that issue, the court in *McAfee* essentially addressed two separate questions: (1) whether the sale between the manufacturer and the middleman [7] involved merchandise that was "for exportation to the United States," and if so, (2) which of the two possible sales prices (*i.e.*, the price paid by the middleman or the price paid by the purchaser) was proper for valuation purposes.

Regarding the first question, the court determined that "[w]here clothing is made-to-measure for individual United States customers and ultimately sent to those cus-

---

7. There was no dispute that the sale between the middleman and the purchaser could serve as a statutorily proper basis for valuation.

tomers, the reality of the transaction between the distributors and the tailors is that the goods, at the time of the transaction between the distributors and tailors, are 'for exportation to the United States.'" 842 F.2d at 319, 6 Fed.Cir. (T) at 98. Upon concluding that the merchandise sold by the manufacturers to the middleman was made for exportation to the United States, the court was then faced with deciding which price should be used as the basis for appraising the transaction value.

In addressing that question, the court found guidance from *United States v. Getz Bros. & Co.*, 55 CCPA 11 (1967), a decision binding upon us in which the determination of transaction value of imported merchandise in the context of a three-tiered distribution was also involved. As the court in *McAfee* succinctly stated:

> [t]he issue in *Getz* was whether valuation of certain plywood should be at the manufacturer's price to a foreign middleman or that middleman's price to the United States customer. Two holdings in that case are significant here. First, a sale need not be to purchasers located in the United States to provide the basis for valuation. Second, *if the transaction between the manufacturer and the middleman falls within the statutory provision for valuation, the manufacturer's price, rather than the price from the middleman to his customer, is used for appraisal.* [Citations omitted.]

*McAfee*, 842 F.2d at 318, 6 Fed.Cir. (T) at 97 (emphasis added). Following the holdings of *Getz*, the court in *McAfee* held that the transaction value of the imported garments should have been determined on the basis of the Hong Kong tailors' assembly price, rather than on the basis of the price paid by the U.S. purchasers to the distributor.

■ Although the court in *McAfee* recognized that "[a] determination that goods are being sold or assembled for exportation to the United States is fact-specific and can only be made on a case-by-case basis," *id.* at 319, 6 Fed.Cir. (T) at 98, that caveat pertains specifically to determining whether a certain sales price falls within the statutory definition of transaction value under 19 U.S.C. § 1401a(b)(1). However, once it is determined that both the manufacturer's price and the middleman's price are statutorily viable transaction values, the rule is straightforward: the manufacturer's price, rather than the price from the middleman to the purchaser, is used as the basis for determining transaction value. Indeed, the court noted that

> ... if the importer establishes that his claimed, lower valuation falls within the statute, the importer is entitled to the benefit of that valuation even though Customs' valuation also satisfies the same statutory requirements. While an argument could be made that Customs should have the option to impose the higher duty in such circumstances, ... precedent is to the contrary.

*Id.* at 318, 6 Fed.Cir. at 97.

■ The government argues that the so-called "first sale" rule of *Getz* and *McAfee* should not apply to every case where there is a manufacturer, a middleman, and a purchaser, regardless of the facts involved. We agree. Conceivably, mechanical application of the rule whenever there is a three-tiered distribution system could lead to inequitable results where the manufacturer's price is set artificially low. However, the rule only applies where there is a legitimate choice between two statutorily viable transaction values. The manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United States and when the manufacturer and the middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price. As the government itself recognizes, that determination can only be made on a case-by-case basis. In this case, the vehicles that were the subject of the KHI–NIC contract were manufactured for a specific United States purchaser, the MTA. They were unquestionably intended "for exportation to the United States" and had no possible alternative destination.

At trial, the government argued that the transaction between KHI and NIC did not

fall within the statutory definition of transaction value because the sales price negotiated between KHI and NIC was not the product of arm's length bargaining. The trial court, however, rejected the government's allegations that KHI and NIC were "related parties" under 19 U.S.C. § 1401a(g) and that there was no sale for exportation between KHI and NIC. The court determined that the "agreements between NIC and KHI were [not] of a different nature from the foreign transactions in either *Getz* and *McAfee.*" 786 F.Supp. at 1009–10.

On appeal, the government contends that the price paid by NIC to KHI under the KHI–NIC contract cannot represent the correct appraised transaction value of the imported vehicles because that contract did not involve the sale of complete vehicles. According to the government, KHI did not "own" the U.S.-made components found in the imported vehicles and thus the contract between KHI and NIC only involved the sale of the vehicles' Japanese-made components. In support of its position, the government relies on Article 3 of the KHI–NIC contract, which provided that the price negotiated between KHI and NIC of ¥ 80,-002,100 per vehicle was subject to change with any change in the quantity of Japanese-made components as compared to U.S.-made components. We reject the government's contention.

Under the KHI–NIC contract, KHI agreed to manufacture 325 rapid transit passenger vehicles in accordance with the contract between NIC/NIAC and the MTA, and NIC agreed to pay for them. Although KHI was required to use a specified quantity of U.S.-made components in the fabrication of the vehicles, that requirement did not render the contract as merely one for the sale of components made in Japan. A breakdown between the Japanese and American content of the vehicles was necessary for purposes of establishing financing credit from the Export–Import Bank of Japan. Any change in the content ratio would have an effect on such credit, and thus the KHI–NIC contract provided for compensatory price adjustments. The government has failed to establish that the use of U.S.-made components in the manufacture of the imported vehicles in any way undermined the legitimacy of the price negotiated between KHI and NIC for the purchase of the completed vehicles or that the sales price did not accurately reflect the price that would exist in a true arm's length transaction.

Accepting that both the manufacturer's price and the middleman's price may serve as the basis of transaction value, the critical issue on appeal here centers upon which price is legally proper. In view of the controlling and binding authority of *McAfee*, we hold that the transaction value of the imported passenger cars at issue must be based on the KHI–NIC contract price. *See also Generra Sportswear Co. v. United States*, 905 F.2d 377, 381 n. 7 (Fed.Cir. 1990).

The trial court, however, determined that *McAfee* was distinguishable from the instant case and thus did not consider it controlling authority in appraising the transaction value of the imported vehicles. Instead, the court employed the analysis set forth in *Brosterhous*, 737 F.Supp. 1197 (Ct. Int'l Trade 1990), in determining that the transaction value should be based on the price paid by the purchaser. We agree with NIAC that the trial court committed reversible error in failing to follow the controlling authority of *McAfee.*

Although the trial court cited differences in the material facts of *McAfee*, none supports its conclusion that those differences mandate a different result. The trial court determined that *McAfee* is inapplicable because it involved "assembled merchandise" within the meaning of 19 C.F.R. § 152.103 [8] and did not involve the valuation of manufactured goods. The court found that KHI

---

**8.** 19 C.F.R. § 152.103(a)(3) (1992) provides:
   *Assembled merchandise.* The price actually paid or payable may represent an amount for the assembly of imported merchandise in which the seller has no interest other than as the assembler. The price actually paid or payable in that case will be calculated by the addition of the value of the components and required adjustments to form the basis for the transaction value.

had an interest in the imported vehicles other than as an assembler because KHI was extensively involved in the negotiations with the MTA and that KHI possessed a significant stake in the ensuing contract between MTA and NIAC. That distinction, however, does not take this case out from under the rule of *McAfee*. In fact, it emphasizes KHI's role in the export of the vehicles to the United States, supporting the conclusion that its sale to NIC is the legally-controlling transaction.

The ultimate issue in *McAfee* was whether the assembly price of the imported merchandise, rather than the price paid by the purchaser, should serve as the basis for determining transaction value. Similarly, the critical issue here is whether the sales price paid by NIC to KHI should serve as the basis for appraising the transaction value of the imported vehicles. *McAfee* speaks directly to that question and answers it in the affirmative. That case is not only applicable here, it is dispositive.

In the interest of clarifying the law, we consider it necessary to examine the case of *Brosterhous, Coleman & Co. v. United States*, 737 F.Supp. 1197 (Ct. Int'l Trade 1990), upon which the trial court relied in reaching its decision. The court in *Brosterhous* held that where there are two transactions that can be considered to be sales for importation to the United States, "Customs policy is that transaction value should be calculated according to the sale which most directly caused the merchandise to be exported to the United States." *Id.* at 1199.

The U.S. Customs Service issued a seminal ruling in CLA–2 CO:R:CV:V, 542928 BLS, TAA ə 57, C.S.D. 83–46, 17 Cust.B. 811 (January 21, 1983) in which it stated its position that "the transaction to which the phrase 'when sold for exportation to the United States' refers when there are two or more transactions which might give rise to a transaction value, is the transaction which most directly causes the merchandise to be exported to the United States." C.S.D. 83–46, 17 Cust.B. at 813. In so ruling, Customs acknowledged that under 19 U.S.C. § 1401a(b), as it existed before

amendment by the Trade Agreements Act of 1979, "it was possible to use as the sale for exportation to the United States for purposes of determining statutory export value a sale from a foreign seller to a foreign buyer, who in turn sold the merchandise to a United States importer." However, Customs departed from that view because the Trade Agreements Act replaced "export value" with "transaction value" as the primary basis for valuation. Thus Customs concluded that "[c]ases decided under the prior law are not, therefore, necessarily precedent under the [Trade Agreements Act]." C.S.D. 83–46, 17 Cust.B. at 813.

We reject the Customs Service's rationale as being legally unsound. A similar argument was rejected by the court in *McAfee*, which recognized that "the language of the earlier statute is not significantly different from the ... provision of the current statute." *McAfee*, 842 F.2d at 318, 6 Fed.Cir. at 97. We agree with NIAC that the 1979 amendment did not change the operative language of the statutory provision for valuation which requires that the sale be "for exportation to the United States." Further, we can discern nothing in the legislative history of the 1979 amendment that suggests that Customs, in determining the transaction value of imported merchandise, should undertake an investigation focusing on which of two transactions most directly caused the exportation. The "Customs policy" followed by *Brosterhous* proceeds from an invalid premise. To the extent *Brosterhous* is inconsistent with this court's decision in *McAfee* by requiring a weighing of the relative importance of two viable transactions, it is overruled. *See Strott v. Derwinski*, 964 F.2d 1124, 1128 (Fed.Cir.1992).

## II. The Government's Counterclaim

■ Having concluded that the transaction value of the imported vehicles at issue is properly based on the price paid by NIC to KHI, we now address the issue whether the trial court erred in granting the government's counterclaim. In granting summary judgment in favor of the government on the reliquidation claim, the trial court

granted the government's counterclaim alleging that certain amounts, *viz.*, a commission paid by NIC to NIAC, financing costs, and insurance costs, were improperly deducted from the dutiable value of the imported vehicles. On appeal, NIAC only contests the dutiability of the commission it received from NIC as compensation for NIAC's services in procuring U.S.-made components entitled to duty exemption under item 807.00, TSUS.

Pursuant to an agreement between NIC and NIAC dated March 17, 1982, NIC agreed to pay NIAC a commission of 2.5% "of the delivered cost to NIAC as reflected in the purchase order ... of all American made fabricated components purchased by NIAC for sale to NIC, which were furnished free of charge to KHI for incorporation into the R–62 cars." Under this agreement, NIAC received $2,356,294.78 from NIC as compensation for the cost of shipping the U.S.-made components to Japan. Upon liquidation, Customs deducted $6,568.87 per car from the dutiable value to reflect the deductible buying commission.

At trial, the government argued that the commission deduction was improper. The trial court agreed, relying on *Rosenthal–Netter, Inc. v. United States*, 12 C.I.T. 77, 679 F.Supp. 21 (1988), *aff'd, adopted*, 861 F.2d 261 (Fed.Cir.1988). It concluded that in order to qualify for a deductible buying commission, there must be an agency relationship and that no such agency relationship existed between NIC and NIAC. The trial court based its finding that NIAC was not a *bona fide* buying agent of NIC on the March 17, 1982 agreement between NIC and NIAC. Article 12 of that agreement, entitled "Independence," provided in pertinent part that "NIAC is and shall be at all times an independent contractor and shall not be deemed to be an agent or employee of NIC for any purpose whatsoever." Accordingly, the trial court held that "[b]ecause NIAC was not NIC's agent, the commissions are not entitled to be deducted from dutiable value." 786 F.Supp. at 1010.

On appeal, NIAC argues that the government failed to overcome the presumption that the deductions from dutiable value allowed by Customs at the time of liquidation are correct. Moreover, NIAC claims that under long-standing policy of the Customs Service, all payments directly allocable to American-made components must be deducted from appraised value, regardless whether NIAC was NIC's buying agent or an independent contractor. We are unpersuaded by NIAC's arguments in view of the binding authority of *Rosenthal–Netter*.

This court adopted the opinion of the Court of International Trade in *Rosenthal–Netter*, which holds that in order to establish that a buying commission is deductible from dutiable value, "the [importer] has the burden of proving the existence of a *bona fide* agency relationship and that the charges paid were, in fact, *bona fide* buying commissions." 679 F.Supp. at 21. Upon examination of the record, we agree with the trial court's finding that a *bona fide* agency relationship did not exist between NIC and NIAC. Thus, we conclude that NIAC's buying commission is not entitled to be deducted from the dutiable value of the imported vehicles and that the trial court did not err in granting the government's counterclaim.

## CONCLUSION

The controlling authority of *McAfee* mandates that the transaction value of the imported vehicles at issue be based on the price of the sale from the manufacturer to the middleman. Additionally, the buying commission received by NIAC is not entitled to be deducted from dutiable value in the absence of a *bona fide* agency relationship. We reverse the trial court's grant of summary judgment, affirm the trial court's grant of the government's counterclaim, and remand the case with instructions to the trial court to enter judgment in favor of NIAC on its claim for reliquidation, subject to the government's counterclaim.

## COSTS

Each party is to bear its own costs.

REVERSED–IN–PART, AFFIRMED–IN–PART, AND REMANDED.