# United States Court of Appeals for the Federal Circuit

---

**MEYER CORPORATION, U.S.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1570

---

Appeal from the United States Court of International Trade in Nos. 1:13-cv-00154-TJA, 1:13-cv-00181-TJA, 1:13-cv-00182-TJA, 1:13-cv-00226-TJA, 1:13-cv-00227-TJA, 1:13-cv-00258-TJA, 1:13-cv-00259-TJA, 1:13-cv-00266-TJA, 1:13-cv-00322-TJA, 1:13-cv-00323-TJA, 1:13-cv-00405-TJA, 1:14-cv-00118-TJA, 1:14-cv-00277-TJA, 1:15-cv-00018-TJA, 1:15-cv-00019-TJA, 1:15-cv-00091-TJA, 1:15-cv-00092-TJA, 1:15-cv-00191-TJA, 1:15-cv-00332-TJA, 1:16-cv-00112-TJA, 1:16-cv-00271-TJA, 1:17-cv-00186-TJA, 1:20-cv-03835-TJA, 1:21-cv-00103-TJA, Senior Judge Thomas J. Aquilino, Jr.

---

Decided:  December 13, 2024

---

JOHN M. PETERSON, Neville Peterson LLP, New York, NY, argued for plaintiff-appellant.  Also represented by PATRICK KLEIN; JOHN DONOHUE, Philadelphia, PA; RICHARD F. O'NEILL, Seattle, WA.

BEVERLY A. FARRELL, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, AIMEE LEE, PATRICIA M. MCCARTHY, JUSTIN REINHART MILLER; PAULA S. SMITH, Office of the Assistant Chief Counsel, Bureau of Customs and Border Protection, United States Department of Homeland Security, New York, NY.

_____

Before PROST, HUGHES, and CUNNINGHAM, *Circuit Judges*.

HUGHES, *Circuit Judge*.

This case returns to us on appeal following a remand in *Meyer Corp., U.S. v. United States*, 43 F.4th 1325 (Fed. Cir. 2022). In that case, we held that the United States Court of International Trade had misinterpreted our precedent by imposing requirements beyond what the statute and regulations demand when determining that Meyer Corporation, U.S. was not entitled to rely on a "first-sale" price for the dutiable value of its imported cookware. On remand, the trial court again held that Meyer was not entitled to rely on its first-sale price, finding that Meyer's failure to produce financial documents for its parent holding company was dispositive of the issue. Because the trial court improperly applied an evidentiary presumption against Meyer and failed to address record evidence, we once again vacate and remand for the trial court to reconsider whether Meyer may rely on its first-sale price.

I

We briefly discuss the parties and the history of this case before turning to the merits of the current appeal. This case concerns duties that U.S. Customs and Border Protection assessed on cookware imported by Meyer Corporation, U.S. (Meyer). Some cookware was manufactured in Thailand, and some was manufactured in

China. The manufacturers in Thailand and China sold finished cookware to distributors in Macau and Hong Kong, respectively, and then to the U.S. importer, Meyer. The manufacturers, distributors, and importer are all related, with common parent and shareholder Meyer International Holdings, Ltd. (Meyer Holdings).

Relevant here, Meyer requested that Customs value its cookware based on the first-sale price that its affiliated distributors paid to the manufacturers. *See Meyer Corp., U.S. v. United States*, No. 13-00154, 2021 WL 777788, at \*3 (Ct. Int'l Trade Mar. 1, 2021) (*Meyer II*).[1] Customs rejected Meyer's request to use the first-sale price and instead assessed duties based on the second-sale price that Meyer paid to its distributors. *Id.* at \*4.

Meyer protested Customs' decisions and then appealed to the Court of International Trade. *Id.* Following a bench trial, the trial court affirmed Customs' decision "to deny 'first sale' treatment." J.A. 89. In doing so, the trial court held that, under our decision in *Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992), an importer wishing to rely on the first-sale price bears the burden to show that the first sales were "(1) bona fide sales that are (2) clearly destined for the United States (3) transacted at arm's length and (4) absent any distortive nonmarket influences." *Meyer II*, 2021 WL 777788, at \*1, \*5 (citing *Nissho Iwai*, 982 F.2d 505. For both Meyer's Chinese-manufactured products and its Thai-manufactured products that were made in part from Chinese inputs, the trial court found that Meyer had not provided adequate information to prove that its first sales met the last

---

[1]    For clarity, we adopt the same short form references as the trial court. "*Meyer I*," as used by the trial court, refers to its pre-trial opinion granting-in-part summary judgment, *Meyer Corp. v. United States*, 255 F. Supp. 3d 1348 (Ct. Int'l Trade 2017). *See* J.A. 1–2.

requirement: that they were free of "market-distortive influence, either with respect to the plaintiff directly or the provision of inputs generally." *Id.* at *6, *51. The trial court thus concluded that Meyer could not rely on the first-sale prices. *Id.* at *50–51.

Meyer appealed to this court, and we held that "[t]he trial court misinterpreted our decision in *Nissho Iwai* to require any party to show the absence of all 'distortive nonmarket influences.'" *Meyer Corp., U.S. v. United States*, 43 F.4th 1325, 1332 (Fed. Cir. 2022) (*Meyer III*). We explained that "[t]here is no basis in the statute for Customs or the court to consider the effects of a non-market economy on the transaction value" and that "[t]he statute requires only that 'the relationship between [the] buyer and seller did not influence the price actually paid or payable.'" *Id.* (quoting 19 U.S.C. § 1401a(b)(2)(B)) (third alteration in original). Accordingly, we vacated and remanded "for the court to reconsider whether Meyer may rely on the first-sale price." *Id.* at 1333.

On remand, the trial court repeated many of its previous findings—with references to non-market economy effects excised—and again held that Meyer was not entitled to first-sale valuation of its cookware and subsequently "affirmed" its earlier judgment in *Meyer II*. *Meyer Corp., U.S. v. United States*, 614 F. Supp. 3d 1376, 1381 (Ct. Int'l Trade 2023) (*Meyer IV*). Meyer timely appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

II

"We review the Court of International Trade's conclusions of law *de novo*." *Ford Motor Co. v. United States*, 286 F.3d 1335, 1340 (Fed. Cir. 2002). "Following a trial, we review the court's findings of fact for clear error." *Id.*

### III

On appeal, Meyer asserts that the trial court failed to comply with our remand order requiring reconsideration of whether Meyer may rely on the first-sale price. In raising this argument, Meyer alleges that the trial court improperly relied on an adverse evidentiary inference and failed to give due consideration to other record evidence. Meyer also argues that this case requires us to provide a definitive interpretation of "the firm" as used in 19 C.F.R. § 152.103(l)(1)(iii). We address each issue in turn.

### A

### 1

Under Section 402(b) of the Tariff Act of 1930, as amended, Customs is instructed to set the transaction value of imported merchandise as "the price actually paid or payable for the merchandise when sold for exportation to the United States" plus additional amounts for certain specified costs not relevant here. 19 U.S.C. § 1401a(b)(1). Where the transaction takes place between a related buyer and seller, the statute states that the transaction value is viable "if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable." *Id.* § 1401a(b)(2)(B). The transaction price between related parties is also acceptable "if the transaction value of the imported merchandise closely approximates . . . the transaction value of identical merchandise, or of similar merchandise, in sales to unrelated buyers in the United States." *Id.* § 1401a(b)(2)(B)(i).

The statute's corresponding regulation, 19 C.F.R. § 152.103(l)(1), lists ways for Customs to find that the relationship between the buyer and seller did not influence the price. Two of the three tests are relevant here: the "normal pricing practices" test and the "all costs plus

profit" test. As the name suggests, Customs will find that the "normal pricing practices" test is satisfied "[i]f the price has been settled in a manner consistent with the normal pricing practices of the industry in question." *Id.* § 152.103(l)(1)(ii). Likewise, the "all costs plus profit test" is met "[i]f it is shown that the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time . . . , in sales of merchandise of the same class or kind." *Id.* § 152.103(l)(1)(iii).

In *Nissho Iwai*, we addressed which price Customs should use as the transaction value in a multi-tiered import scheme in which all the entities are related—the first-sale price the distributor paid to the manufacturer or the second-sale price the importer paid to the distributor. 982 F.2d at 508–11. There, we explained that "once it is determined that both the first- and second-sale prices are statutorily viable transaction values, the rule is straight-forward: the manufacturer's first-sale price, rather than the distributor's second-sale price, is used as the basis for determining transaction value." *Meyer III*, 43 F.4th at 1332 (quoting *Nissho Iwai*, 982 F.2d at 509) (cleaned up and alterations omitted). The *Nissho Iwai* decision also elaborated on the meaning of "statutorily viable," stating that "[t]he manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United States and when the manufacturer and middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price." *Id.*

2

As explained above and in our *Meyer III* opinion, the trial court in *Meyer II* erroneously interpreted *Nissho Iwai's* statement about "the absence of any non-market influences" to mean that, because China was a non-market economy, Meyer had "the burden of demonstrating that

inputs from [China], as well as with respect to the transactions from its producer/seller to its middleman/buyer, were procured at undistorted prices." *Meyer II*, 2021 WL 777788, at \*6. To that end, the trial court held that financial records pertaining to Meyer Holdings, the ultimate parent company of the Meyer group, were "relevant to examining whether any non-market influences affect the legitimacy of the sales price." *Id.* Meyer did not produce any Meyer Holdings financials, asserting that it did not possess such records and that they were not relevant to the issues posed by the case. Subsequently, the trial court's rejection of Meyer's first-sale price hinged almost entirely on the absence of Meyer Holdings financials. The trial court noted that for the "all costs plus profit" test, "costs are obviously critical to that determination, and the real costs of inputs from [China] are suspect, given its status as a nonmarket economy country." *Id.* at \*50. The trial court went on to explain its concerns about interference by Meyer Holdings:

> Even if "true" costs of such inputs could be determined, Meyer Holding presumptively has had the ability to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates. Without financial statements, the court has no concept of the extent to which the finances of the Meyer group units are truly independent "silos" of one another, or the extent to which there might have been state influence or assistance to some degree. Statutory assists do not encompass financial assistance, of course, but the broader concern here is over market-distortive influence, either with respect to the plaintiff directly or the provision of inputs generally.

*Id.* at \*51. The trial court also acknowledged that Meyer Holdings was not a party to the litigation and Meyer was entitled to assert its inability to obtain parent company information, but it nevertheless found the lack of documents meaningful, stating:

> However, given that the parent has an interest in seeing these types of matters resolved favorably, it is therefore presumed to be forthcoming, even unprompted, to provide whatever [Customs] deems necessary to assist in their resolution, and the fact that in that regard there has apparently been considerable "resistance" throughout this case to that not-unreasonable discovery request and the "assistance" that the parent could have provided its subsidiary to address necessary questions with respect to concerns over nonmarket influences, speaks volumes.

*Id.* In conclusion, the court held that "[a]ll of the foregoing leads the court to doubt that accurate ascertainment of the 'true' value of the 'price paid or payable' at the first sale level in the customs duty sense has been demonstrated in this case." *Id.*

Following our remand order, the trial court's *Meyer IV* opinion once again held that the lack of Meyer Holdings documents was dispositive to Meyer's case. The trial court concluded that "[e]ven ignoring the fact that the claimed transaction values involve inputs from a non-market-economy country in the merchandise at issue, this court still cannot ignore plaintiff's non-responsiveness to defendant's request for information during discovery." *Meyer IV*, 614 F.Supp.3d at 1380. The court also stated that "[t]he fact that the government herein was not provided with the financial information pertinent to plaintiff's parent company hampered its ability to discern whether or not the parent of the plaintiff provided any form of assistance to reduce costs." *Id.* Next, the trial court quoted

nearly the entirety of its analysis from *Meyer II* but noted that it had "excis[ed] any inference of 'nonmarket consideration' in accordance with the CAFC opinion." *Id.* The trial court concluded this opinion by stating:

> [T]he prior analysis shows that plaintiff's failure to provide the financial information requested by it during discovery provided an independent reason as to why Meyer could not demonstrate a true first-sale value absent of influence—not from a nonmarket-economy country *per se*—but from the relationships of the related parties. And the plaintiff had been forewarned by the court's *Meyer I* decision as to the importance of that financial information but chose not to supplement its discovery responses.

*Id.* at 1380–81.

3

We agree with Meyer that the trial court failed to comply with our remand order instructing it to "reconsider whether Meyer may rely on the first-sale price" by disregarding the trial record and instead applying an improper evidentiary presumption. The trial court's opinion makes clear that it suspected Meyer of being dishonest in its reporting of "costs" for use in the "all costs plus profit" test. *See id.* at 1379 (trial court repeating its prior statement that, even ignoring non-market economy effects, "the costs of the inputs from [China] are suspect"); *id.* at 1380 ("[T]he foregoing leads the court to doubt that accurate ascertainment of the 'true' value of the 'price paid or payable' at the first sale level in the customs duty sense has been demonstrated in this case."). In reaching this conclusion, the trial court cites no record evidence to support its belief that Meyer inaccurately reported costs. Rather, the court relied entirely on speculation that, because Meyer did not produce the Meyer Holdings

financial documents, the documents might have shown underreported costs.

During discovery, Meyer objected to the production of Meyer Holdings' documents on the grounds that it did not have possession, custody, or control of such documents. J.A. 33. There is nothing in the record to show that the government ever objected to the lack of production or pursued a motion to compel or subpoena against Meyer or Meyer Holdings. *See* Appellant's Br. 14 n.6. Further, other record evidence seems to support Meyer's position that it did not possess Meyer Holdings' documents. *See, e.g.*, *Meyer II*, 2021 WL 777788, at *8 (noting that Mr. Johnston, Meyer's former managing director, "averred that, despite being related companies within the Meyer [g]roup," each separate company is "structured with different 'silos' of business that operate independently of and competitively with each other, and that" Meyer "was accountable for its own profitability, independent of any other Meyer group entity."). Yet, without citing any of this record evidence, the trial court presumed ill intent. The trial court mused that "Meyer Holding[s] presumptively has had the ability to influence the price paid or payable" and that Meyer Holdings was "presumed to be forthcoming, even unprompted, to provide whatever [Customs] deems necessary to assist in their resolution." *Meyer IV*, 614 F.Supp. 3d at 1380. The trial court accordingly found that it "sp[oke] volumes" that Meyer exhibited "considerable 'resistance' throughout this case to that not unreasonable discovery request," given "the 'assistance' that the parent could have provided its subsidiary to address necessary questions." *Id.*

The trial court's language here is tantamount to the discovery sanction of an adverse inference. Rule 37(b)(2)(A) of the Court of International Trade states that if a party "fails to obey an order to provide or permit discovery, . . . the court . . . may issue further just orders" including "directing that the matters embraced in the order

or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Given that there were no discovery orders with which Meyer failed to comply—a prerequisite for adverse inferences under Rule 37(b)(2)(A)—the trial court had no basis to speculate about what the Meyer Holdings documents might have revealed, had they been produced. While some statutory provisions that fall within the purview of the Court of International Trade more freely authorize the imposition of adverse inferences, assessing transaction value for related parties under 19 U.S.C. § 1401a(b)(2)(B) is not one of them. *C.f. Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1370 (Fed. Cir. 2014) (explaining that, in the context of countervailing and antidumping duties under 19 U.S.C. § 1677e, "the statute permits Commerce to apply an adverse inference in selecting from among the facts otherwise available when an interested party fails to cooperate by not acting to the best of its ability to comply with a request for information").

Further, the trial court's finding that Meyer could not prove its case without Meyer Holdings financial documents is particularly inappropriate because, in doing so, the trial court ignored other record evidence produced by Meyer, including sworn testimony from employees and an expert opinion that was based on examination of company records. The trial court did not grapple with any of this evidence: it did not evaluate the credibility of the witnesses, weigh the evidence that was before it, or explain why, as a matter of law, that record evidence was or was not sufficient for Meyer to meet its burden. Indeed, aside from the trial court's wholesale adoption of the government's proposed findings of fact in *Meyer II*, the court's analysis does not even acknowledge—in its original determination or on remand—that there *was* other record evidence besides the missing Meyer Holdings documents. *See Meyer II*, 2021 WL 777788, at *50–51; *Meyer IV*, 614 F. Supp. 3d at 1379–81.

In our previous decision, we instructed the trial court to "reconsider whether Meyer may rely on the first-sale price." *Meyer III*, 43 F.4th at 1333. It did not do so in any meaningful way. Accordingly, we vacate and remand once more.[2] The trial court should evaluate, on the extensive record before it, whether Meyer has met its burden to show that its first-sale price is a viable transaction value under 19 U.S.C. § 1401a(b)(2)(B). As discussed above, there are two alternate ways that Meyer may prove its case: the "all costs plus profit" test and the "normal pricing practices" test. *See* 19 C.F.R. § 152.103(l)(1). Because Meyer raised both tests as possible bases for using first-sale price, *see* J.A. 106, 108, so too should the trial court consider both tests in its opinion. We note that this decision should not be read as putting a thumb on the scale regarding the outcome on remand. Rather, it is an acknowledgement that Meyer was entitled to have its case heard on the merits of the record it presented, not disposed of based on conclusory speculation.

---

[2]    By ordering a remand for further consideration, we reject Meyer's argument that a new trial is necessarily required. *See* Appellant's Br. 43–46. Meyer had the opportunity to present evidence during a weeklong trial, after which the trial court adopted the government's proposed findings of facts and stated that Meyer's facts were "not inaccurate," *Meyer II*, 2021 WL 777788 at *50, but did not make extensive conclusions of law based on those facts. The "extensive record" developed before the trial court, that record is "more than sufficient for conducting reconsideration." *Meyer IV*, 614 F. Supp. 3d at 1381. Allowing for additional evidentiary proceedings would only prolong this already protracted case. To the extent that Meyer continues to seek a new trial, that request is best directed to the trial court.

## B

Meyer also argues on appeal that this case requires us to provide an interpretation of "the firm" as used in the "all costs plus profit" test. *See* 19 C.F.R. § 152.103(l)(1) ("If it is shown that the price is adequate to ensure recovery of all costs plus a profit which is equivalent to *the firm's* overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind, this would demonstrate that the price has not been influenced." (emphasis added)). Meyer notes that "[i]n an uncodified policy statement interpreting this Regulation, Customs has stated that the term 'firm' is 'normally' interpreted to be the parent company." Appellant's Br. 26; *see also id*. at n.14 (citing *Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication)*, U.S. Customs and Border Protection (April 2007), at 9; J.A. 38–39). Meyer asserts that this interpretation is incorrect, and the correct interpretation is that "firm" refers to "the firm which charged the price in the related party sale." *Id.* at 26. Accordingly, Meyer argues that "[s]ince the [Meyer Holdings] financials could not be used in an 'all costs plus profits' test, they lost their 'consequence to the determination of the action' and became irrelevant." *Id.* at 33.

We decline to address Meyer's arguments about the correct interpretation of "the firm" because the trial court's opinion was not based on any interpretation—correct or incorrect—of that phrase. The government's brief explains: the trial court's relevancy determination regarding the Meyer Holdings financials "did not rest on [Customs'] interpretation of the term 'firm' in 19 C.F.R. § 152.103(l)(1)(iii) as meaning a parent company, but instead turned on whether the parent holding company provided support or guidance that caused a market-distortive effect on the first sale prices." Appellee's Br. 15. We agree.

In *Meyer II*, the trial court acknowledged Meyer's arguments regarding "the appropriate 'firm' to analyze under the 'all costs plus profit test,'" but noted that regardless of whether Meyer's argument was correct, it wanted the Meyer Holdings financial statements in order to assess whether Meyer had accurately reported the "costs" arm of the "all costs plus profit" test. *Meyer II*, 2021 WL 777788, at *50 ("[W]hether it is true that for the 'all costs plus profit' test no [Customs] regulation requires that the 'firm' mentioned in 19 C.F.R § 152.103(l)(1)(iii) be the 'parent' of the importing party . . . , costs are obviously critical to that determination, and the real costs of inputs from [China] are suspect, given its status as a nonmarket economy country."). The *Meyer IV* opinion also did not rely on any interpretation of "the firm" in its decisions, even though the trial court appears to have voiced agreement with Meyer on its proposed interpretation. *Meyer IV*, 614 F. Supp. 3d at 1380 (trial court restating its own findings from *Meyer II* and noting that "[i]t also found that 'no [Customs] regulation requires that the "firm" mentioned in 19 C.F.R. § 152.103(l)(1)(iii) be the "parent" of the importing party.'"). However, because the trial court's opinion was not based on the challenged statutory term, we reserve the question of proper interpretation of 19 C.F.R. § 152.103(l)(1)(iii) for another day.

## IV

Because the Court of International Trade failed to meaningfully evaluate whether Meyer was entitled to rely on first-sale price in accordance with our remand order, we again vacate and remand for the court to reconsider whether Meyer may rely on the first-sale price. We need not reach Meyer's alternative argument that the trial court should have also rejected Meyer's second-sale price if it found that the costs were inaccurate for first-sale price.

**VACATED AND REMANDED**

MEYER CORPORATION, U.S. v. US                                    15

COSTS

No costs.