**MERCK, SHARP & DOHME INTL., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 96–20.**
**Court No. 89–01–00034.**

United States Court of International Trade.

Jan. 19, 1996.

Barnes, Richardson & Colburn, New York City (Sandra Liss Friedman, Alan Goggins, and Frederic D. Van Arnam, Jr.), for plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mark S. Sochaczewsky); Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service (Sheryl A. French), Washington, DC, of counsel, for defendant.

## *OPINION*

GOLDBERG, Judge:

This matter is before the Court following trial *de novo*. In this action, Merck, Sharp & Dohme International ("Merck") claims that the United States Customs Service ("Customs") improperly appraised Indocin SR ("Indocin"), a drug which Merck imported from an affiliated corporation in Holland. More specifically, Merck claims that Customs improperly appraised the value of an assist, indomethacin, which Merck produced and provided free of charge to its Holland affiliate. The Court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988), and upon review of the evidence presented at trial, the Court finds that Customs erred in appraising the indomethacin assist.

## I. BACKGROUND

The merchandise at issue, Indocin, was manufactured in Holland by Merck, Sharp & Dohme BV, an affiliate of the plaintiff. The Holland affiliate manufactured the Indocin using two assists [1] that were provided free of charge by the plaintiff. One assist consisted of empty capsules which Merck purchased from an unrelated supplier. The second assist consisted of a drug component called indomethacin, which Merck manufactured.

When the Indocin entered the United States, Customs appraised the drug based on its transaction value pursuant to 19 U.S.C. § 1401a(b) (1988). Customs determined transaction value by adding the following: (1) the price Merck paid to the Holland affiliate for processing; (2) the value of the two assists, which was determined by using the figures that were declared on the invoice; and (3) the freight and handling charges associated with shipping the assists to Holland. (Compl. & Answer ¶ 5.) The only element of appraisement that Merck contests is Customs' appraisement of the indomethacin assist.

## II. DISCUSSION

It is undisputed that transaction value includes the value of an assist. 19 U.S.C. § 1401a(b)(1)(C) (1988). In addition, it is undisputed that when a buyer produces an assist, the basis for appraising the assist is cost of production. 19 C.F.R. § 152.103(d)(1) (1983). Merck claims that Customs erred because instead of appraising the indomethacin assist based upon its cost of production, Customs used the value declared on the invoice, which represented a transfer price. According to Merck, the transfer price is not the indomethacin's cost of production.[2] Rather, the cost of production can be found by examining the business records that Merck presented to the Court at trial. The defendant responds that Merck has failed to prove that its cost of production figures are accurate. As Customs' appraisement is presumed correct, the issue in this case is whether Merck has met its burden of proving by a preponderance of the evidence that its cost of production figures for the indomethacin assist are accurate. See 28 U.S.C. § 2639(a)(1) (1988).

### A. The Necessity Of Source Documentation

The defendant does not dispute that the proper basis for appraising the indomethacin assist is cost of production. (Compl. & Answer ¶ 7.) However, the defendant claims that Customs' appraisement should be sustained because Merck cannot satisfy its burden of proving that its cost of production figures are accurate. The defendant claims that Merck cannot sustain its burden of proof in part because despite the fact that Merck has some documentation to support its cost of production figures, Merck cannot provide necessary source documentation to Customs or the Court.

The defendant supports its position with the trial testimony of Carole Jablonski, an auditor for Customs. Ms. Jablonski testified that in the course of her involvement with this case, she requested certain source documentation from Merck, which Merck failed to provide. More specifically, Ms. Jablonski testified that Merck failed to provide the following: (1) detailed cost records, including invoices and proof of payment supporting the indomethacin's standard costs; (2) detailed cost records, including payroll records supporting the standard labor costs; (3) detailed cost records including overhead pool and allocation base supporting the stan-

---

1. An assist consists of, among other things, merchandise consumed in the production of the imported merchandise or materials incorporated in the imported merchandise when supplied by the buyer to the seller free of charge or at a reduced cost. 19 U.S.C. § 1401a(h)(1)(A) (1988).

2. A "transfer price" is an accounting term reflecting "the price charged by one segment (subunit, department, division, etc.) of an organization for a product or service supplied to another segment of the same organization." Charles T. Horngren & George Foster, *Cost Accounting* 835 (6th ed. 1987). At trial, Merck's witnesses were unable to determine how the transfer price in this instance was derived. However, they did explain how Merck generally derived a transfer price. The transfer price would be derived by starting with standard cost of production, and then adding a variety of additional costs; then this result would be multiplied by a gross number to yield the transfer price.

dard overhead costs; (4) invoices and proof of payment supporting the packing costs; (5) detailed explanation and supporting cost records for the "assay" and "cert" charges that appear on the bill of materials; and (6) details supporting the excluded charges. According to Ms. Jablonski, Merck's cost of production figures cannot be adequately verified without this source documentation.

The Court does not agree with the defendant's contention that Merck's failure to produce this source documentation necessarily precludes Merck from proving by a preponderance of the evidence that its cost of production figures are accurate. The Court notes that Merck's standard practice is to retain the source documents that were requested for a period of seven years; after this period, the documents are destroyed. While the indomethacin at issue in this case was produced in 1981, 1982, and 1983, Customs failed to request source documentation from Merck until 1991 or 1992. Consequently, when Customs asked Merck to provide source documents, the documents no longer existed. In addition, the Court notes that Customs does not, as a matter of routine, require importers to produce source documentation in order to substantiate their cost of production figures. Hence, the facts in this case do not lead the Court to find that Merck has attempted to hide its documentation from Customs or the Court. Moreover, it is significant that while Merck lacks the particular source documentation requested by Customs, it does have other documentation that it wishes the Court to consider. *Compare with Andy Mohan, Inc. v. United States,* 74 Cust.Ct. 105, 396 F.Supp. 1280 (1975) (granting judgment in favor of defendant in light of destruction of documentary evidence, evidentiary deficiencies, ambiguities, and discrepancies in plaintiff's evidence), *aff'd,* 63 CCPA 104, 537 F.2d 516 (1976).

■ Customs' statutes and regulations do not require an importer to prove its case by submitting specific documentation. Consequently, the Court will not constrain Merck by requiring it to prove its cost of production figures in a rigid and proscribed way. *Cf. Aurea Jewelry Creations, Inc. v. United States,* 13 CIT 712, 714–15, 720 F.Supp. 189, 191 (1989) (stating that even in light of a documentation requirement for drawback recovery, "Customs may not establish such a strict standard of compliance as to make drawback recovery prohibitive"), *aff'd* 9 Fed. Cir. (T) 95, 932 F.2d 943 (1991). The Court does not find that the specified source documentation is essential for plaintiff to prove its case. Instead, Merck may prove that its cost of production figures are accurate by providing evidence that the Court deems satisfactory.

Of course, the Court must carefully scrutinize the evidence in support of Merck's cost of production. *Andy Mohan,* 74 Cust.Ct. at 112, 396 F.Supp. at 1286. Omissions and inconsistencies in Merck's proof have significance; they militate against Merck in its quest to satisfy its burden of proof. *See Id.* at 113, 396 F.Supp. at 128; *Murjani Int'l Ltd., v. United States,* 17 CIT 1035, 836 F.Supp. 883 (1993) (suggesting that inconsistencies in what a plaintiff claims is the proper value should be adequately explained). However, satisfactory proof is not required to be perfect. *Coats & Clark, Inc. v. United States,* 74 Cust.Ct. 13, 16, C.D. 4581, 1975 WL 26979 (1975). Consequently, the Court will examine Merck's evidence, and then defendant's objections to Merck's evidence, to evaluate whether Merck has proven by a preponderance of the evidence that its cost of production data is accurate.

### B. *The Sufficiency Of Evidence Presented By Merck*

■ At trial, Merck presented the testimony of Thomas Eisenberger, the director of financial services for its manufacturing division. In order to determine the indomethacin's cost of production, Mr. Eisenberger examined Merck's business records. He determined that the standard cost of producing the indomethacin was $98.553 per kilogram for 1981, $122.263 per kilogram for 1982, and $157.834 per kilogram for 1983.

In support of this claim, Merck submitted the chemical division's cost master listings for the years 1981, 1982, and 1983. (Pl.Conf. Ex. 1.) The cost master listing is a report which contains the standard cost of producing the indomethacin during the years in

question on a per-kilogram basis. In addition, Merck submitted the pharmaceutical division's cost masters, which also contain the indomethacin's cost of production from the perspective of the pharmaceutical division. (Pl.Conf.Ex. 2.) Both of these documents substantiate Mr. Eisenberger's testimony regarding the cost of producing the indomethacin. Merck also produced the journal entry, where the cost of the first shipment of indomethacin sent to Holland was recorded. (Pl.Conf.Ex. 3.) The amount of the journal entry correlates to the cost of production stated on the cost masters for 1981: when the amount stated in the journal entry is divided by the number of kilograms in the shipment, it equals the per-kilogram amount on the cost masters.

Defendant alleges that even if Merck is not necessarily precluded from satisfying its burden of proof because it lacks requested source documentation, Merck has failed to prove that its asserted cost of production figures for the indomethacin are accurate. Defendant argues that based on its analysis of the data submitted by Merck, Merck's cost of production figure is understated and that additional items should be included in cost of production. More specifically, defendant claims that the following items should be included: (1) two charges, "assay" and "cert," that appear on the pharmaceutical division's cost masters; (2) a packing charge that appears on the chemical division's cost master listings; and (3) a percentage of costs that Merck failed to include in its cost of production. The Court addresses these issues in turn.

### 1. *Assay and Cert Charges*

The defendant claims that two charges, "assay" and "cert," should be added to cost of production because they are reported on the pharmaceutical division's cost masters. (Pl. Conf.Ex. 2.) According to the testimony of Ms. Jablonski, these charges should be added because the cost masters, which are also known as bills of materials, purport to list a company's cost of production. Based on the fact that the assay and cert charges are listed on the bills of materials, the defendant argues that without source documentation to

the contrary, the Court should presume that these charges are components of cost of production. Upon review of the evidence, the Court is satisfied that these charges are not components of cost of production.

Merck's witness, Mr. Eisenberger, explained that the charges listed on the pharmaceutical division's cost masters do not exclusively represent costs of producing the indomethacin. Mr. Eisenberger explained that the chemical division was responsible for producing the indomethacin that went to Holland. In contrast, the pharmaceutical division was responsible for receiving the Indocin from the Holland affiliate after it was further processed and then bringing the drug to the market. Thus, the pharmaceutical division's cost master reports cost of production from its own perspective: while it includes the cost of producing the indomethacin, it also includes other costs, such as processing in Holland, the duty and freight charges incurred to bring the Indocin back from Holland, and quality control once the product arrived back in the United States.

Indeed, testimony presented at trial showed that the assay and cert charges listed on the pharmaceutical division's cost master should not be included as components of cost of production. Mr. Eisenberger testified that the assay charge represented costs incurred in Holland for foreign processing. He also testified that the cert charge represented the costs of freight and duty incurred to transfer the final product, Indocin, from Holland to the United States, and some costs for quality inspection, after it arrived. This testimony convinces the Court that these charges are not dutiable as costs of producing the indomethacin.

The government further argues that Merck's claim that the assay charge represents the costs of foreign processing is contradicted because the invoice value for foreign processing indicates a different value. The Court does not agree. Items located on the bill of materials represent *costs* and include the cost incurred for foreign processing. The invoice value, on the other hand, does not necessarily represent costs. Rather, the invoice value for foreign processing in this case reflected an amount that Merck was

*billed and paid* to the Holland affiliate for processing the Indocin. Mr. Eisenberger testified that the invoice value was higher than the cost because profit was added into the invoice value.

### 2. *Packing Charges*

The defendant claims that charges representing packing costs that appear on the chemical division's cost master listings should be added to the indomethacin's cost of production. (Pl.Conf.Ex. 1.) The defendant argues that because these charges are listed separately on the cost master listings from the indomethacin's cost of production, these costs were not included in cost of production. Merck responds that although the packing costs appear on its cost master listings, and represent additional costs, they were not actually incurred with respect to the indomethacin at issue.

In support of Merck's contention, Mr. Eisenberger testified that the indomethacin's cost of production included the cost incurred for packing the indomethacin into the standard configuration, which was a 25 kilogram drum. Mr. Eisenberger explained that the packing costs on the cost master listings represented additional costs incurred whenever a configuration other than the standard was used: additional charges would be incurred when a configuration other than the standard was used because extra packaging and handling were required. At trial, however, Merck submitted records confirming that the shipment at issue was packed in the standard configuration. (Pl.Ex. 5.) This evidence convinces the Court that the packing charges that appear on the cost master listings were not incurred in transporting the indomethacin at issue to Holland. Consequently, the Court finds that the packing charges that appear on the cost master list-

ing should not be included in the cost of producing the indomethacin.[3]

### 3. *Excluded Period Costs*

The defendant also claims that certain costs that were excluded from Merck's asserted cost of production should probably be included in the cost of production. The defendant argues that without the ability to audit Merck's books, it is impossible to verify the nature of these costs, and to determine whether they must be considered components of cost of production. Upon consideration of the evidence, the Court is satisfied that Merck's method of deriving its cost of production accurately captures all costs that are required.

Merck's witness, Lloyd Woods, testified regarding the expenses that were included and excluded from cost of production during the years in question. (Pl.Ex. 6.) Generally, the cost of production included expenses that bore a clear relationship to the production process, while it excluded expenses that were further removed from the production process. The cost of production included the cost of raw materials, direct labor hours, and an allocation of overhead. Overhead, in this context, is defined as "all other expenses directly related to production but not assigned to a specific physical unit of product." *Id.* Examples of overhead include steam, utilities, maintenance, waste treatment, quality control testing, supplies, supervisory salaries, and employee benefits.

Costs that Merck excluded from cost of production were recorded as period costs. These excluded costs basically consisted of general and administrative costs that are further removed from the production process, such as the salaries of corporate executives, and the maintenance and utility expenses associated with corporate offices.[4] The ratio-

---

3. At trial, Merck raised an alternative argument which would also prevent additional packing costs from being added in this case: Merck claimed that packing costs (even when incurred) are not dutiable to the cost of an assist. (*See* Tr. at 101–04, 171–75.) However, the Court has found that the additional packing costs on Merck's cost master listing were not incurred in this case. In addition, although Merck acknowledges that its asserted cost of production included packing costs, Merck does not argue that it is

entitled to a reduction in cost of production. Consequently, the Court finds it unnecessary to address whether packing costs may be dutiable to the cost of an assist.

4. The Court notes that one of the costs that Merck excluded was the variance, if any, resulting from the difference between standard and actual costs. The Court discusses this exclusion in Part C of its opinion.

nale behind Merck's exclusion of these items was that although the corporate executives may have a fiduciary responsibility regarding the production of the indomethacin, they are not clearly involved with the production process.

Mr. Woods testified that Merck's method of allocating costs to cost of production is the same as that used throughout the chemical industry and most other industries. Mr. Woods also testified that Merck's method of determining cost of production is consistent with generally accepted accounting principles ("GAAP"). More specifically, *AICPA Accounting Research Bulletin No. 43*, which is a source of GAAP, supports Merck's method of determining which costs are included in cost of production, i.e. general and administrative costs not clearly related to production are excluded and carried as period costs.

■ Upon review, the Court accepts Merck's method of determining cost of production. Merck presented detailed testimony at trial proving how it allocated costs to cost of production. Merck also provided ample evidence to show that its method of determining cost of production is the predominant method used throughout the industry, and is in accordance with GAAP. In contrast, the defendant failed to present any evidence, either directly or through cross-examination of Merck's witnesses, showing that the costs that Merck excluded were clearly production related. Moreover, the defendant failed to present to the Court a workable alternative for determining cost of production. Consequently, the Court accepts Merck's method of allocating costs to cost of production.[5]

## C. Merck's Exclusion of Variances from Cost of Production

The government also claims that Merck's cost of production is inadequate because it fails to include the variances representing the difference between standard and actual costs. The Court disagrees and finds Merck's use of standard costs adequate.

Merck's cost of production figures are standard, in contrast to actual costs. The standard cost o. production was computed in advance of the actual production process. It was a prediction of actual costs to be incurred based upon negotiated contracts for raw materials and other indicators. Merck's practice was to exclude the variance representing the difference between standard and actual costs from its calculation of cost of production, except when the variance was unusually large. Mr. Woods, a witness for Merck, testified that Merck routinely compared the actual costs to the standard costs. Because of the careful process Merck used to determine the standard cost of production, the variances were virtually always very small. The variances for the years in question were: 2% for 1981, 0% for 1982, and −3% for 1983. Hence, the evidence showed that Merck's standard cost for the indomethacin was very close to actual costs during the years at issue.

5. Merck urges the Court to hold that when proposed cost of production information is consistent with GAAP, as it is in this case, then Customs lacks authority to reject it. In other words, Merck argues that all cost of production information that is consistent with GAAP *must* be accepted for appraisement purposes. Merck relies on 19 U.S.C. 1401a(g)(3) (1988), which states in pertinent part:

Information that is submitted by an importer, buyer, or producer in regard to the appraisement of merchandise may not be rejected by the customs officer concerned on the basis of the accounting method by which that information was prepared, if the preparation was in accordance with [GAAP].

In addition, Merck relies on legislative history, which states: "for purposes of determining the proper value to be added for an assist, the information available in the buyer's commercial record system would be used to the greatest extent possible." S.Rep. No. 249, 96th Cong. 1st Sess. 120 (1979); U.S.Code Cong. & Admin.News 1979, pp. 381, 508. The Court does not agree with Merck's reading of § 1401a(g)(3). If the provision was intended to have the sweeping effect that Merck suggests, then the statute would have been written to carry out that position in much clearer terms. In addition, while such a reading may be attractive in a case such as this where the statutes and regulations do not give guidance on how to determine cost of production, GAAP, as a general matter, is only an accounting method, and does not speak to whether a item may be dutiable for Customs purposes. Thus, the Court declines to hold that adherence to GAAP is dispositive for determining the appraisement of an assist.

The fact that a company records standard costs does not make its records inadequate or unusable from an appraisal standpoint. In this case, because Merck kept track of the actual costs, and compared to the figure to the standard costs, it is able to determine that the variances for the years in question were small. Merck also has been producing indomethacin for many years, and the variance has always been very small. Because the Court is satisfied that the variances for the years in question were negligible, the Court finds Merck's use of standard costs to be acceptable. In addition, the Court notes that in other contexts, Customs' policy is to accept standard cost accounting systems, when such systems meet certain criteria, all of which were satisfied here.[6]

## CONCLUSION

Upon review, the Court finds that the testimony of Merck's witnesses, and the documentary evidence presented by Merck, are sufficient to prove Merck's cost of production. The objections that defendant has raised to Merck's evidence do not persuade the Court that Merck's cost of production figures for the indomethacin are inaccurate. Accordingly, Merck has rebutted the presumption of correctness in favor of Customs' appraisement of the indomethacin.

Further, the Court finds that Customs erred by using the value declared on the invoice, or transfer price, to appraise the indomethacin. Customs' regulations mandate that when a buyer produces an assist, the basis for appraising the assist is cost of production. 19 C.F.R. § 152.103(d)(1) (1983). Customs should not have appraised the indomethacin assist using the transfer price because the evidence fails to show that the transfer price represented the cost of production. Indeed, transfer prices may be cost based, market based, or based on negotiated prices, and there is "no requirement that the chosen transfer price have any specific rela-

tionship to either cost or market price data." Charles T. Horngren & George Foster, *Cost Accounting:* 836 (6th ed. 1987). Customs only used transfer price in this case because it believed Merck's cost of production information was inadequate. However, in light of the Court's finding that Merck's proof of its cost of production is adequate, the Customs' use of the transfer price is unjustified and will not be sustained. Judgment will be entered in favor of plaintiff.

## ORDER

This case having been heard at trial and submitted for decision; and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED,** and **DE-CREED:** that the appraisement of the subject merchandise by the United States Customs Service ("Customs") is reversed; it is further

**ORDERED, ADJUDGED,** and **DE-CREED:** that the value of the indomethacin assist provided by plaintiff to Merck, Sharp & Dohme BV is $98.553 per kilogram or $7.79 per thousand capsules for 1981; $122.263 per kilogram or $9.17 per thousand capsules for 1982; and $157.834 per kilogram or $11.84 per thousand capsules for 1983; it is further

**ORDERED, ADJUDGED,** and **DE-CREED:** that Customs shall reliquidate the entries at issue in this action, reducing their transaction value to reflect the correct value of the indomethacin assist; and it is further

**ORDERED, ADJUDGED,** and **DE-CREED:** that Customs shall refund any excess duties collected, together with interest, as provided by law.

---

6. Customs' policy is illustrated by Customs Ruling No. HQ 400231 (Oct. 5, 1976), which states:
   In summary, we conclude that a standard cost system, supported by an adequate compliance system and constituted in accordance with [GAAP], which is based upon actual experience, which takes into consideration all expenses actually incurred and properly a part of

constructed value, which provides for regular revision of the standard to accommodate variances in costs, and which is able to recognize and adjust for unacceptable variances in costs as they occur, will, for Customs purposes, provide acceptable cost data for determining dutiable value.