**VWP OF AMERICA, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Slip Op. 97-139.**
**Court No. 93–12–00803.**

United States Court of
International Trade.

Sept. 25, 1997.

Barnes, Richardson & Colburn (James S. O'Kelly, Alan Goggins and Matthew Goldstein ), New York City, for plaintiff.

Frank W. Hunger, Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Saul Davis), for defendant.

## OPINION

MUSGRAVE, Judge.

Plaintiff Victor Woollen Products of America ("VWPA") brings this action to contest the valuation made by the United States Customs Service ("Customs") on imports of wool melton fabrics. Customs valued the subject merchandise based on the price paid by U.S. customers of VWPA. VWPA contends that the correct transaction value is the price between VWPA and its supplier and parent company Les Lainage Victor Ltée., or Victor Woollen Products, Ltd., of St. Victor de Beauce, Quebec, Canada ("VWPC"). The Court has jurisdiction over this action under 28 U.S.C. § 1581(a) and finds that Customs correctly valued the subject merchandise pursuant to 19 U.S.C. § 1401a(b) on the basis of VWPA's selling prices to its customers in the United States.

### Background

The subject merchandise is wool melton fabrics that are primarily used in the apparel industry for such articles as varsity jackets that have melton wool bodies with leather sleeves. The plaintiff, VWPA, imported the melton fabrics from the manufacturer and parent company in Canada, VWPC. VWPC sold melton fabrics directly to its U.S. customers prior to 1989 using a U.S. sales agent, Concept III. Prior to 1989, the terms of sale between VWPC and its U.S. customers was free on board ("FOB") at the Canadian factory. VWPA was activated as a Delaware corporation in November of 1989 to distribute the melton fabrics produced by VWPC to customers in the U.S., setting up a three-tiered transaction. At that time, sales contracts were begun directly between VWPA and the U.S. customers. The terms of sale to the U.S. customers remained FOB Canadian factory. In 1991, the terms of sale to U.S. customers were changed to FOB Jackman, Maine or other U.S. port of entry while the terms of sale between VWPC and VWPA remained FOB Canadian factory. Concept III remained the U.S. agent for VWPA sales in the U.S.

1. Customs HQ 544745 at 8 (February 19, 1992).

VWPA has no office, no warehouses, carries no inventory and has a single employee in the U.S. VWPA maintained its own financial records and all of the services that VWPC provided to VWPA were properly expensed to VWPA. VWPA paid U.S. income tax and it maintained a post office box and a bank account in Maine.

On the basis of concern that VWPC was avoiding import duties, as reported by one of VWPC's competitors in the U.S., Customs initiated an audit of the transactions between VWPC and VWPA in 1990. The result of this investigation was published in Customs HQ 544658, dated March 26, 1991, where Customs found that there were no *bona fide* sales between VWPC and VWPA. As a consequence, Customs valued the merchandise based on the sales price between VWPA and its U.S. customers. VWPA requested reconsideration after the change of terms of sale to FOB Jackman, Maine. Despite the change in the FOB point, all shipments continued to be made from Canada directly to the U.S. customer, not VWPA. Customs investigated the claim and issued HQ 544745 which held:

(1) Under the facts presented, no *bona fide* sale occurred between [VWPC] and VWPA. Title passed directly from [VWPC] to the U.S. customer. The price actually paid or payable is the price the U.S. customer paid for the merchandise under transaction value.

(2) Under the terms presented, the sale for exportation for purposes of transaction value would be the sale between VWPA and the U.S. customer. Therefore, under transaction value, the price actually paid or payable for the merchandise is the price paid by the U.S. customer to VWPA.[1]

The subject entries made between November, 1992 and January, 1993, were appraised on the price charged by VWPA to its U.S. customer in accordance with Customs HQ 544745. VWPA claims that the correct transaction value is between VWPC and VWPA or, in the alternative, if transaction value cannot be determined, the appraise-

ment of the subject entries should be based on deductive value.

### Standard of Review

Under 28 U.S.C. § 2639(a)(1), Customs' decision is "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision."[2] However, recent decisions from the Court of Appeals for Federal Circuit ("CAFC") have ruled that the presumption of correctness applies solely to factual questions and that this Court's duty is to find the correct result. The duty of the Court to find the correct result in a valuation case stems from both legislative and judicial sources. The CAFC recently found that "the trial court ... must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative.... [T]he court's duty is to find the correct result, by whatever procedure is best suited to the case at hand." *Jarvis Clark Co. v. United States*, 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). Pursuant to the statute, "[i]f the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision." 28 U.S.C. § 2643(b).[3] The Court reviews this case *de novo* in order to determine the questions of: (1) the influence of the related parties on sales price; (2) which transaction clearly marked the subject merchandise for export to the U.S.; and (3) the role of deductive and computed value calculations in determining the correct valuation of the merchandise.

### Discussion

The controversy centers around the interpretation and application of the valuation statute, 19 U.S.C. § 1401a. Customs and VWPA assert that the subject merchandise should be valued pursuant to transaction value as described in the statute.

§ 1401a. Value

(a) Generally

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, for the purposes of this chapter, on the basis of the following:

(A) The transaction value provided for under (b) of this section.

* * *

(b) Transaction value of the imported merchandise

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, ...

19 U.S.C. § 1401a (1988). Customs found that the sale between VWPA and its U.S. customers constituted the transaction that most directly caused exportation to the United States and Customs liquidated the merchandise based on the value of the price charged by VWPA to its U.S. customers. VWPA claims that the correct basis for transaction value is the sale between VWPC and VWPA claiming that this transaction actually precipitated the melton fabrics' importation.

### I. Transaction Value

 The Court, subject to the statutory mandate, finds that the first inquiry in determining the value of the subject merchandise is to ascertain which transaction directly caused the importation into the U.S.; in other words, did the transaction between VWPC and VWPA or the transaction between VWPA and its U.S. customers effect the importation of the melton fabric. Embedded in this query is the determination of whether the transaction between VWPC and VWPA

---

**2.** 28 U.S.C. § 2639(a)(1) (1994).

**3.** *See Goodman Mfg. v. United States*, 13 Fed. Cir. (T) ——, ——, 69 F.3d 505, 508 (1995) (the statutory presumption of correctness attaches only to an agency's factual determinations) *and*

*Rollerblade, Inc. v. United States*, 15 Fed. Cir. (T) ——, ——, 112 F.3d 481, 483–84 (1997) (legal issues are not afforded deference under 28 U.S.C. § 2639 or under the administrative deference standard promulgated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

was at arm's length, *i.e.* was it a *bona fide* sale or did VWPA act as a mere agent of VWPC, rendering the sale between the parent and its subsidiary a fiction. VWPA contends that the test for *bona fide* sales is whether title and risk of loss passes from seller to buyer. Pl.'s Post Trial Br. at 9. The Court finds that the valuation statute clearly focuses on basing imported merchandise on the "price paid or payable." Risk of loss evaluation is not dispositive in a finding of *bona fide* sales since title passage between related parties does not effectively create a sale where control is still maintained by the parent over the subject merchandise. Further, the Court finds that there was no credible showing that risk of loss ever devolved upon the American subsidiary, VWPA. Mere passage of title may simply involve a paper transaction. The burden on VWPA is to prove that the purchase price of melton fabric from VWPC was negotiated at arm's length, reflecting terms bargained between unrelated parties.

▆▆▆▆ VWPA asserts that Customs found two *bona fide* sales for exportation in HQ 544745, dated February 19, 1992. Pl.'s Post Trial Br. at 3. However, there can be no misinterpretation of the holding in HQ 544745, where Customs stated in no uncertain terms:

> HOLDING:
>
> (1) Under the facts presented, no *bona fide* sale occurred between [VWPC] and VWPA. Title passed directly from [VWPC] to the U.S. customer. The price actually paid or payable is the price the U.S. customer paid for the merchandise under transaction value.

The Court finds that Customs determined that only one sale, the sale between VWPC and it U.S. customers, was operative as a basis for valuation under the statute. Although Customs concedes in its Post Trial Brief that two *bona fide* sales occurred, the Court finds that Customs' interpretation of its own ruling is misplaced.[4] Customs mistakenly separates the mandate of the statute

into two discrete requirements: (1) a finding of a *bona fide* sale; and (2) a sale that directly causes importation into the United States. The Court finds that no distinction exists in the statute; where there is a finding that the transaction is not a *bona fide* sale, that transaction certainly cannot be said to directly cause the importation. Simply put, transaction value cannot be based on a transaction that is found not to be a sale. In consonance with Customs HQ 544745, the Court, subject to the statute for transaction value, finds only one *bona fide* sale occurred, the sale between VWPC and its U.S. customers, which directly caused the importation of melton fabric into the U.S. for the reasons that follow.

## II. Arm's Length Transactions and *Bona Fide* Sales

VWPA contends that *Nissho Iwai American Corp. v. United States*, 11 Fed. Cir. (T) ——, 982 F.2d 505 (1992) stands for the proposition that "where there is more than one sale for exportation transaction value should be based on the manufacturer's price to the middleman, and not the middleman's sale price." Pl.'s Post Trial Br. at 4. The court in *Nissho Iwai*, however, found that

> once it is determined that both the manufacturer's price and the middleman's price are *statutorily viable* transaction values, the rule is straightforward: the manufacturer's price, rather than the price from the middleman to the purchaser, is used as the basis for determining transaction value.

*Nissho Iwai American Corp. v. United States*, 11 Fed. Cir. (T) ——, ——, 982 F.2d 505, 509 (1992) (emphasis added). VWPA conveniently omitted the operative test at issue here: whether there was a statutorily viable transaction value between VWPC and VWPA.

Other courts have used a litany of factors in ascertaining arm's length transactions. When these factors are applied to the transaction between VWPC and VWPA it is clear

---

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**4.** Customs argued in its brief that, "Customs stated that the transaction between [VWPC] and VWPA was a *bona fide* sale; however, Customs

did not use that sale as the basis for TV [transaction value] because it treated that sale between VWPA and the United States customers as the sale that most directly caused the importation of the merchandise." Def.'s Post Trial Br. at 1.

that it was not concluded at arm's length. The Court first turns to the finding in *E.C. McAfee Co. v. United States,* 6 Fed. Cir. (T) 92, 842 F.2d 314 (1987) where the court cited an early precedential decision from its predecessor court in *United States v. Getz Bros. & Co.,* 55 C.C.P.A. 11 (1967). Even though the statute had been amended since *Getz,* the *McAfee* court found that the "language of the earlier statute is not significantly different from the quoted provision of the current statute,"[5] with respect to the determination of *bona fide* sales. In *Getz,* the court found that the test for value was whether the merchandise was " 'freely sold' or 'offered for sale' to 'all those who cared to buy such goods in such market' in the ordinary course of trade." *United States v. Getz Bros. & Co.,* 55 C.C.P.A. 11, 21 (1967). Applying the requirements gleaned from *Getz,* the test is whether the melton fabric sold by VWPC to the U.S. market was "freely sold" or "offered for sale" to "all those who cared to buy such goods in [the U.S.] market" in the ordinary course of trade.

▪ In order for U.S. customers to obtain the melton fabric produced by VWPC, purchases would have to be made with VWPA or its agent Concept III. The record confirms that there were no direct sales between VWPC and its U.S. purchasers of melton fabric. This fact has not only made comparisons with U.S. market prices impossible but it has also led the Court to find that the goods were not freely sold or offered for sale as contemplated by *Getz.* Any and all melton fabrics manufactured by VWPC that were purchased by customers in the U.S. were distributed by VWPA. Although exclusive sales agency does not automatically create a bar to a finding of arm's length sales transactions, the Court finds that the melton fabric was not freely sold or offered for sale to all of those who cared to buy it in the U.S. market in the ordinary course of trade.

In another case that utilized the export value statute, the court focused on the restrictions that the parent placed on the subsidiary as determinative of a finding of freely sold. *Bjelland & Co. v. United States,* 52

C.C.P.A. 38, 1965 WL 8296 (1965). In *Bjelland,* the court affirmed the appraised value of brisling sardines and kipper snacks, sold under the popular "King Oscar" brand, based on the actual selling price between the Norwegian parent and its U.S. wholly-owned subsidiary, Bjelland. The court in *Bjelland* examined a number of factors in determining whether sales were at arm's length; the factors included whether the purchasers: (1) buy the subject merchandise only from the exporter; (2) pay for the merchandise on delivery; (3) maintain warehouses; (4) guarantee their customers' stock against price decreases without help from the exporter; (5) furnish product liability insurance; (6) assume responsibility for returns; and (7) accept the prices dictated by the exporter without negotiation. *Id.* at 40. Applying these factors to the instant case, the Court finds that VWPA only bought merchandise from VWPC and was not required to pay for the melton fabric at the time of delivery.[6] VWPA did not maintain any warehouse space nor did VWPA guarantee their customers' stock against price increases since VWPA did not warehouse any merchandise. There was no showing that VWPA provided product liability insurance or accept responsibility for returns. Finally, VWPA accepted prices dictated by VWPC as evidenced by the fact that the U.S. customers paid the same price for the melton fabric both before and after the incorporation of VWPA. All of these factors constitute a formidable showing that the transaction between VWPC and VWPA was not concluded at arm's length. Further, the Court notes that the application of the factors from *Bjelland* to the instant case can be a meaningless exercise when the evidence leads to the conclusion that VWPA is merely a U.S. agent or alter ego for VWPC. For example, due to the fact that VWPA and VWPC share the same directors and officers, it would be difficult to contemplate legitimate, bargained for price negotiations.

Finally, the Court turns to the findings in *Orbisphere Corp. v. United States,* 13 CIT 866, 726 F.Supp. 1344 (1989), where the

---

5. *E.C. McAfee Co. v. United States,* 6 Fed. Cir. (T) 92, 842 F.2d 314, 318 (1987).

6. "The transactions constituted classic sales on credit." Pl.'s Post Trial Br. at 9.

Court examined the relationship between a Swiss parent and its U.S. subsidiary. Orbisphere produced oxygen-sensing devices in Switzerland and sold them through its U.S. subsidiary to its U.S. customers. Orbisphere's U.S. subsidiary maintained four sales offices in the U.S. that would solicit orders and send them to the New Jersey office where they were forwarded to the Swiss plant for production. The Court found that the U.S. subsidiary bore the cost of insuring and risk of loss as well as meaningful passage of title, unlike the situation involved in the instant case. The Court also placed stock in the fact that the U.S. subsidiary employed personnel in four offices throughout the country indicating that the U.S. subsidiary was not a mere shell company.

In the instant case, VWPA employs only one person who works out of his house in New York, not the Jackman, Maine address, signifying that no considerable work is performed in the U.S. In *Orbisphere*, the Court also examined the fungibility of the subject merchandise and found that the orders placed by the U.S. customers were specific and the subject merchandise was not fungible. The importance of this fact is that the customers expected a specific product requiring that the U.S. sales offices spend substantial time in developing and pricing a particular article to suit the distinct needs of each customer. In contrast, the melton fabric at issue here is fungible in that the U.S. customers have no need for VWPA to perform any engineering or pricing functions. VWPA's U.S. customers all received the same melton wool fabric, albeit in different styles and amounts. The Court finds that these elements from *Orbisphere* lead to the conclusion that VWPA was merely a selling agent and alter ego of VWPC rendering the transaction between them incapable of being utilized as a basis for transaction value as it was not a *bona fide* sale negotiated at arm's length.

Applying the tests for *bona fide* sales for importation into the U.S. established in *Nissho Iwai, McAfee, Getz, Bjelland* and *Orbisphere* to the instant case, the Court finds that there was one *bona fide* sale, the sale

between VWPC and its U.S. customers which directly caused the importation into the U.S. Because of the evidence regarding the nature of the relationship between VWPC and VWPA, the Court finds that the two companies are one and the same for purposes of administration of the import statutes implicated here. Therefore, the Court finds that the valuation of imported melton fabric is correctly based on the transaction value of the sale between VWPA and its U.S. customers since VWPC effectively *is* VWPA.

VWPA cites *United States v. Massce & Co., et al.,* 21 C.C.P.A. 54 (1933) and *Orbisphere Corp. v. United States,* 13 CIT 866, 726 F.Supp. 1344 (1989) for the proposition that the transaction between VWPA and its U.S. customers cannot qualify for transaction value since the sale is between two U.S. entities. Pl.'s Post Trial Br. at 17. Unlike the present situation, the court found two *bona fide* sales involved in the three-tiered transactions in both *Massce* and *Orbisphere.* The Court finds that VWPA is the alter ego of VWPC and as such, is a Canadian company in function with respect to the import statute. Therefore, the Court finds that the sale between VWPA and its U.S. customers is a sale between a Canadian company and U.S. customers which qualifies the sale for transaction value appraisal.

The Court recognizes that the standard for proving *bona fide* sales is high and the burden of proof weighs heavily on the related parties to prove arm's length negotiations. VWPA cites many factual similarities with the importer in another valuation case involving a three-tiered transaction, *J.L. Wood v. United States,* 62 C.C.P.A. 25, 505 F.2d 1400 (1974), where the court found two *bona fide* sales. Pl.'s Post Trial Br. at 6–8. The glaring difference between the two cases is that the parent company in *Wood* sold the subject merchandise to an unrelated third party in the U.S. at the same price while VWPC sold only to VWPA in the U.S. market. As the court in *Wood* stated:

> In this case, we have all necessary market evidence, since Carter, Ltd., sells for export to selected purchasers in the United States–Carter, Inc., and the OEMs. The price to the OEMs and to Carter, Inc., is

the same. Because the OEMs are unrelated to Carter Ltd., or Carter, Inc., further proof of what price the merchandise is able to command in the market is not needed. We join the trial court in saying: "What better proof is there of the price fairly reflecting the market value when sales are made to other unrelated United States concerns at the same basic price."

*J.L. Wood v. United States,* 62 C.C.P.A. at 33, 505 F.2d at 1406. The same situation present in *Wood* was found in *Bjelland,* where the court found that same price sales to unrelated buyers provided the most reliable and incontrovertible proof of an arm's length transaction. VWPA has provided the Court with no such evidence and, in fact, there is overwhelming evidence that VWPA was simply incorporated to elude the substantial duties incurred by importing melton fabric. While the Court recognizes that the intent behind establishing corporations was to enable individuals to be protected from liability in order to promote business and economic growth, companies still must comply with the requirements of the "ordinary course of trade" with respect to the import statutes. The Court will look through the form to find the underlying function. If it is apparent that a subsidiary is merely an alter ego of the parent, the Court will not hesitate to disregard the constructive fiction.

### III. Deductive and Computed Value

■ VWPA argues that if the Court cannot find a representative transaction value, test values of similar merchandise, deductive or computed value may be used for import valuation purposes. Based on the lack of reliability of allocations and computations, the Court rejects VWPA's calculations of test values of similar merchandise, deductive value and computed value. 19 U.S.C. § 1401a(b)(2)(A)(iv) provides:

> 19 U.S.C. § 1401a(b)(2)(A) The transaction value of imported merchandise determined under paragraph (1) shall be the appraised value of that merchandise for purposes of this chapter only if-

> \* \* \*

> (iv) the buyer and seller are not related, or the buyer and seller are related but

the transaction value is acceptable, for purposes of this subsection, under subparagraph (B).

> (B) The transaction value between a related buyer and seller is acceptable for the purposes of this subsection if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable; or if the transaction value of the imported merchandise closely approximates-

>> (i) the transaction value of identical merchandise, or of similar merchandise, in sales to unrelated buyers in the United States; or

>> (ii) the deductive value or computed value for identical merchandise or similar merchandise;

> but only if each value referred to in clause (i) or (ii) that is used for comparison relates to merchandise that was exported to the United States at or about the same time as the imported merchandise.

VWPA asserts that a comparison can be made between its melton fabric and similar merchandise sold from another Canadian melton fabric manufacturer to an unrelated U.S. customer. Pl.'s Post Trial Br. at 13. However, VWPA failed to provide a sufficient showing that expenses such as packing costs, sales commissions, assists, royalties and rebates were properly taken into account. Def.'s Post Trial Br. at 20. The Court finds that the information provided by VWPA on these unrelated parties is insufficient to form a reliable comparison.

■ VWPA also contends that the prices charged by VWPC to VWPA closely approximate both deductive and computed value. Pl.'s Post Trial Br. at 14–17. VWPA calculated deductive and computed values based on audited records from VWPA and the record shows that the allocations were in accordance with Canadian generally accepted accounting principles ("GAAP"). Further, VWPA asserts that Customs rejected the submitted value calculations because the allocations were not in accordance with accepted Customs methodology. The Court agrees

with VWPA that there is no rigid or specific manner with which to construct deductive and computed values. *Merck, Sharp & Dohme, Int'l v. United States*, 20 CIT ——, ——, 915 F.Supp. 405, 408 (1996). However, the Court must be satisfied that the computations are reasonably accurate before they are accepted.

In Customs' audit report of June 16, 1992, it was determined that a number of figures that VWPA used in its comparison values, which mirror the comparisons presented at trial, were suspect. Specifically, in the shipments that Customs examined, VWPA did not include advertising expenses in its allocation of costs that could have been seen by its U.S. customers and were applicable to other shipments to the U.S. market. Customs Audit at 9. In addition, indirect labor and general expense rates were allocated to the price charged to VWPA at a lower rate for melton fabrics compared to VWPC's upholstery product line. *Id.* VWPA explained that these expenses were related to the upholstery line to a much greater extent. VWPA also used general and administrative expense figures that were based on estimated sales and not actual sales for the shipments that were audited resulting in a significant reduction in cost per yard of melton fabric. *Id.* The Customs audit also revealed that VWPA reduced the melton fabric cost charged from VWPC due to financial advantages and volume discounts. *Id.* VWPA contends that the financial advantages were a product of hedging on currency fluctuations which were subtracted from the fabric cost in accordance with GAAP. *Id.* at 10. However, Customs concluded that the calculations on these financial advantages, according to GAAP, were incorrect and that VWPA neglected to include the interest charged on the hedge. *Id.* Customs also found that the volume discount was based on a suspect bulk purchase order issued in anticipation of future small volume orders from U.S. customers. *Id.* Finally, Customs found that the profit rate of VWPA was four times higher than the profit rate of VWPC despite the fact that VWPC manufactured the melton fabric and VWPA had no significant physical presence in the U.S. *Id.* at 11.

The Customs audit, while providing only one facet of the circumstances surrounding the transactions between VWPC and VWPA, reveals that value comparisons using allocations of costs verified and in compliance with GAAP do not necessarily provide the Court with accurate information with respect to the import statute in the U.S. The Court finds that the record is replete with suspect figures and inconsistent allocations of costs. For these reasons, the Court finds that the deductive and computed values that VWPA submitted do not provide reliable comparisons to transaction value and are not acceptable. The Court rejects VWPA's deductive and computed values because of their lack of reliability, not their form.

### Conclusion

For the foregoing reasons, the Court finds that the subject entries of melton fabrics is correctly valued on the price between VWPA and its customers in the United States.